# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 03-1179

VIENNA HURT

VERSUS

WILLIAM J. BARROIS

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 932707
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE
**********

Court composed of Ulysses Gene Thibodeaux, C.J., John D. Saunders, and Arthur J. Planchard[*], Judges.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

Robert Leon Ellender
Richard D. Chappuis, Jr.
Lamont Paul Domingue
Voorhies & Labbé
P. O. Box 3527
Lafayette, LA 70502-3527
Telephone: (337) 232-9700
COUNSEL FOR:
    Defendant/Appellee - William J. Barrois

Anthony M. Fazzio
Janet Kay Culpepper
P. O. Box 2636
Lafayette, LA 70502-2636
Telephone: (337) 235-1111
COUNSEL FOR:
    Plaintiff/Appellant - Vienna Hurt

---

[*]Honorable Arthur J. Planchard, retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Kevin Reeve Duck**
**Duck Law Firm, L.L.C.**
**P. O. Box 2967**
**Lafayette, LA 70502-2967**
**Telephone:  (337) 269-8850**
**COUNSEL FOR:**
      **Plaintiff/Appellant - Vienna Hurt**

THIBODEAUX, Chief Judge.

In this dental malpractice case, Vienna Hurt (Ms. Hurt) appeals a trial court's judgment dismissing her claim against Dr. J. William Barrois[1], D.D.S. (Dr. Barrois) arising from a dental implant procedure. The trial court concluded that Dr. Barrois did not violate the standards of preoperative and postoperative care for dental implants. We disagree with the trial court that Dr. Barrois did not violate the standard of preoperative care, and thus, we reverse, in part, its judgment.

## I.

## ISSUE

Was the trial court manifestly erroneous in finding that Dr. Barrois did not violate the standards of preoperative and postoperative care for dental implants?

## II.

## FACTS

On January 16, 1990, Ms. Hurt sought treatment from Dr. Barrois for the purpose of obtaining sub-periosteal implants. Ms. Hurt was a resident of West Virginia. However, she was visiting with her daughters and decided to have the surgery performed in Lafayette so that she could stay with family following the procedure. On March 23, 1990, Dr. Barrois performed oral surgery on Ms. Hurt. The surgery involved making an incision to the bone of the lower jawbone. Ms. Hurt's jaw lacked attachable tissue that made the procedure more difficult than normal. Normally, the procedure takes approximately three to four hours to complete. Ms. Hurt's procedure took longer because Dr. Barrois experienced difficulty in getting the

---

[1]Also referred to as William J. Barrios, J. William Barrois, and J. William Barrios in plaintiff's and defendant's briefs.

1

tissue to close. Dr. Barrois did not administer or prescribe preoperative antibiotic medication to Ms. Hurt. He testified that he prescribed antibiotics after the procedure.

Dr. Barrois testified that on March 28, 1990, Ms. Hurt had lost some sutures in the anterior section where the tissue was breaking down. Additionally, the tissue in the front part of the jaw area had opened up slightly. On April 4, 1990, she returned to him for follow up treatment. Dr. Barrois testified that the tissue was most likely still open because he still had her on antibiotics. There was no infection present. Ms. Hurt saw Dr. Barrois again on April 11, 1990. Dr. Barrois testified that he removed the remaining sutures, and there was some rubbing of the lower denture. Additionally, he testified that the site may have still been open, but the implant and the graft material were likely not exposed. Dr. Barrois testified that he did not prescribe Ms. Hurt anymore antibiotics on the April 11, 1990 visit.

On May 3, 1990, Ms. Hurt was examined again by Dr. Barrois. He stated in his deposition that the tissue underneath had closed, but there was still a slight opening in the superficial tissue that appeared to be aggravated. On May 23, 1990, Dr. Barrois discovered a fistula in the front lower part of Ms. Hurt's jaw. Dr. Barrois testified that the fistula could have been a result of an infection or granulation tissue. He curetted the fistula, and advised Ms. Hurt that everything looked fine and that she could return home to West Virginia.

On or about June 19, 1990, Ms. Hurt saw Dr. William N. Wine, an oral surgeon in West Virginia. Dr. Wine testified that Ms. Hurt complained about a growth on her lower gum that had gradually developed since the time of the placement of the implant. Dr. Wine biopsied the site to confirm that the growth was non-cancerous and to determine the etiology of the growth. The pathology report

2

from June 21, 1990 indicated that the growth was possibly a fistulous tract that may have occurred as a result of an infection. Dr. Wine advised Ms. Hurt that if the fistula reappeared that she would have to return to him. On July 19, 1990, Ms. Hurt returned to Dr. Wine because the growth had reappeared. Dr. Wine performed a second biopsy. The biopsy revealed a chronic infection that Dr. Wine later curetted. The diagnosis of the pathology report was abscess consistent with draining fistulous tract. The diagnosis was consistent with a chronic infection. Dr. Wine opined that the infection was coming from the framework of the dental implant. Dr. Wine instructed Ms. Hurt to return to Dr. Barrois.

On August 29, 1990, Ms. Hurt returned to Dr. Barrois for treatment. Ms. Hurt continued to see Dr. Barrois until late October when she saw Dr. H. A. McConell, Jr. for the treatment of her infection. Dr. McConnell diagnosed Ms. Hurt with chronic infection of the anterior mandible around the sub-periosteal implant. He referred her to Dr. Heller who saw her on January 14, 1991. A panoramic x-ray of Ms. Hurt's mouth revealed inflammation and infection. Dr. Heller performed surgery and removed an anterior screw and superior strut. The removal of the strut ended the infection. On January 29, 1991, Ms. Hurt returned to Dr. Wine to remove the sutures. Dr. Heller continued to treat Ms. Hurt through September 5, 1991.

Ms. Hurt brought suit against Dr. Barrois alleging dental malpractice. On April 15, 2003, the trial court dismissed Ms. Hurt's claim concluding that Dr. Barrois did not violate the standards of preoperative and postoperative care. Thereafter, this appeal was filed.

3

# III.

## LAW AND DISCUSSION

### *Standard of Review*

An appellate court may not set aside the factual findings of a trial court in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, through DOTD*, 617 So.2d 880 (La.1993). "[W]here there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations are as reasonable." *Rosell v. ESCO,* 549 So.2d 840, 844 (La.1989). However, a reviewing court may reverse a fact finder's determination if such factual findings are not reasonably supported by the record and are clearly wrong. *Stobart,* 617 So.2d 880. Although the trial court findings are accorded great deference, appellate courts have a duty to ascertain whether those findings are justified by the record. *Mart v. Hill,* 505 So.2d 1120 (La.1987). If an appellate court concludes that the trial court's factual findings are clearly wrong, the mere fact that some evidence in the record supports the finding does not require the court to affirm. *Id.*

### *Standard of Dental Care*

Louisiana Revised Statutes 9:2794 provides for the plaintiff's burden of proving malpractice:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by

4

physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

   (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

   (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

The plaintiff must prove the dentist's alleged negligence by a preponderance of the evidence. Injury alone does not raise a presumption that the dentist was negligent. La.R.S. 9:2794(C).

## Preoperative Standard of Care

Our first inquiry is whether Ms. Hurt proved the degree of care ordinarily exercised by dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale under similar circumstances.

Ms. Hurt argues that the preoperative standard of care for this dental implant procedure was to administer antibiotics. She argues that Dr. Barrois failed to administer or prescribe antibiotics before the procedure. Therefore, his actions fell below the standard of care.

The defense took the deposition of Dr. John M. Barksdale, Jr. (Dr. Barksdale). Dr. Barksdale practices general dentistry in Baton Rouge, Louisiana, and is a member of the medical review panel that reviewed this case. Dr. Barksdale testified that Baton Rouge and Lafayette have the same standards of care for general dentistry. He also testified that most implant procedures are performed by general dentists. Dr. Barksdale has performed several dental implant procedures and was tendered as an expert in the field of general dentistry.

As to the preoperative standard of care, Dr. Barksdale testified:

5

Q: As to the surgical—and if I say anything incorrectly, please feel free to correct me. Regarding the surgical placement of the sub-periosteal implant, explain to me what the standard is.

A: Of the surgical placement?

Q: Correct.

A: It's antibiotic coverage, you know, anesthesia for comfort, and then surgically, as he described how he did it, the surgical incision and reflection of tissue and then seating of the implant and then the suturing of the tissue.

Ms. Hurt offered the testimony of Dr. Emil Laga, M.D. (Dr. Laga), a board certified pathologist, whose office is located in New Iberia. Dr. Laga was admitted by the trial court as an expert in the fields of anatomical, clinical and forensic pathology. Dr. Laga previously acted as the Chairperson of the Infection and Disease Control Committee of the Centers for Disease Control (CDC).

Dr. Laga testified as to use of preoperative antibiotics to prevent infection in all lengthy surgical procedures as follows:

Q: Now the bacteria that's in the mouth can be so resilient that this bacteria can even live and exist where there is no oxygen, correct?

A: In other words, supply an antibiotic intravenously prior to the surgical procedure. And that is the recommendation of the CDC; that prior to a procedure that is known to be aggressive and that will involve the periosteum, where you actually pull away that tissue that supplies oxygen and new blood to the bone, where you have a prolonged type of a surgery, more than one hour or more than two hours, there is the recommendation of giving intravenous, not oral, antibiotics prior to making the first cut[.]

In addition, Dr. Laga testified that the recommendation of administering antibiotics before prolonged surgery had been a part of the medical literature for several years before Ms. Hurt's surgery in March of 1990.

6

Q: The text from which I just read carries a copyright date or a publication date of 1988. There has been some suggestion that medical science only recently understood that giving the antibiotics in advance of surgery in a form and in an amount sufficient enough be prophylactic is something that has only recently become understood and known. Do you agree with that?

A: This is not recent. I've looked at a number of other textbooks, even including oral surgery, from 1985 to '90, that carry the same kind of recommendation that you are giving us from the textbook you looked at.

. . . .

Q: And in this particular case, a sub[-]periosteal implant, in view of the way that that procedure is done, qualifies for those CDC guidelines in terms of prophylactic presurgical antibiotics, correct?

A: Definitely, sure.

Dr. Barrois' testimony is also significant in determining the standard of preoperative care. On cross-examination, Dr. Barrois testified as to the standard of preoperative care.

Q: Do you recall what medications, if any, you would have prescribed on March 23rd of '90, or prior to March 23rd of '90?

A: Prior to that? Probably antibiotics and pain medication, decadrone, cortisone. And then we would have given her a Valium or Seconal or a Demerol.

Q: And essentially, the standard requires that; is that correct? And when I say "the standard," I mean physicians in your practice of general dentistry doing this type of implant, the standard essentially would require that there be some anesthesia medication, some medication to address the pain, and antibiotics?

A: That's correct.

Dr. Barrois further testified as to his opinion as to whether prophylactic

7

antibiotics should be have been administered to Ms. Hurt before surgery.

> Q: Okay, so the standard would have been to require you to use a prophylactic antibiotic in this particular case; is that correct?
>
> A: Sure. That's correct.
>
> . . . .
>
> Q: Okay. And would you agree that for the antibiotic to be maximally effective in preventing postoperative infection, the antibiotic must be given before the surgery begins?
>
> A: Not necessarily. I don't necessarily agree with that.
>
> Q: You don't agree with that statement?
>
> A: Not necessarily. I'm not refuting that it's in there, but I don't necessarily think that's true.
>
> Q: Well, we talked about the benefit of prophylactic antibiotics, and you said in Ms. Hurt's case, something that was—what was the word you used to describe her surgery?
>
> A: The magnitude of it?
>
> Q: The magnitude, relative to the magnitude of her surgery, that a prophylactic antibiotic was required, correct?
>
> A: Well, what you also have to realize, too, is that when you're going into a site where there is no sign of infection, okay, and there is not bacteria already in the tissue, it's not an absolute—I mean I know for a fact that the oral surgeons, when they do implants today, they don't start patients on antibiotics beforehand. I mean I know that for a fact.

In sum, Dr. Barksdale, Dr. Barrois' witness, testified that antibiotic coverage is the standard of care. Dr. Laga, Ms. Hurt's witness, testified that the CDC recommends administration of preoperative antibiotics in the type of procedure involved in this case. In addition, Dr. Laga testified that the CDC recommendation was part of the medical literature several years before the procedure in this case.

Finally, Dr. Barrois, himself, testified that the standard required preoperative antibiotics even though this is not the practice of some oral surgeons.

After careful review of the record, we find that the trial court's factual finding as to the preoperative standard of care was not reasonably supported by the record and is clearly wrong. The testimony of Dr. Barksdale, Dr. Laga and Dr. Barrois indicate that administrating or prescribing preoperative antibiotics was the standard of care. The record does not contain any evidence that negates this standard of care.

### *Breach of Standard of Care*

Our second inquiry is whether Ms. Hurt proved, by a preponderance of the evidence, that Dr. Barrois' treatment of her fell below the ordinary standard of care.

Because the standard of care was administration or prescription of preoperative antibiotics, Dr. Barrios breached the preoperative standard of care when he failed to administer or prescribe preoperative antibiotics. Dr. Barrois testified as to whether he provided preoperative antibiotics.

> Q: Okay. You didn't prescribe preoperative or prophylactic antibiotics–
>
> A: Preoperative, no. I think today, if we did the procedure, we'd probably put her on antibiotics.

### *Causation*

Ms. Hurt argues that the failure of Dr. Barrois to conform to the standard of care and administer or prescribe preoperative antibiotics allowed a bacterial invasion of her lower mandible. Ms. Hurt argues that the failure to administer preoperative antibiotics was the cause in fact of her infection. She further argues that

her additional dental consultation was a result of the infection caused by failure to administer preoperative antibiotics.

Dr. Laga testified that the most significant event that lead to the infection was the surgery in March of 1990.

> Q: All right. If we were going to go back in time to the most significant event that would account for the infection, the chronic infection that's showing up in Exhibit 3-A, based upon the evidence you reviewed, have you been able to determine the most significant event that would account for the occurrence of that chronic infection?
>
> A: The most significant event, going back in the time line of what happened to Ms. Hurt, was the surgery that was done back in March.

Dr. Barksdale testified that the source of the chronic infection possibly stemmed from the placement of the sub-periosteal implant:

> Q: Dr. Barksdale, in your opinion, was a biopsy of that area warranted?
>
> A: No.
>
> Q: Why do you say that?
>
> A: Well, she just had a sub-periosteal implant put in. She had a complication in the area, almost not immediately post-op, but it never completely cleared, according to her terms, and then she goes to see somebody. If you take a history and ask what's been going on the last two months, you would know that the high likelihood is that is associated with an infection complication. With an implant, if you understand the implants and know them, that is the obvious conclusion at that point. And so doing a biopsy is purely something that he did because of lack of knowledge of the implant. I just don't—you know, my opinion is, I just don't see why anybody would do a biopsy at that point.

Dr. Dale J. Misiek (Dr. Misiek) is a dentist who specializes in oral and maxillofacial surgery. Dr. Misiek practices in Charlotte, North Carolina, but maintains a license to practice in Louisiana and occasionally practices in New

10

Orleans. Dr. Misiek testified that the source of the infection was the prolonged procedure.

> Q: Okay. So he spends the extra time trying to suture up the friable tissue to close, so that it will close over the implant. And you're saying it never closed?
>
> A: But by not accomplishing the closure at that time-saliva has bacteria in it. Once it gets underneath that metal substructure that's on top of the bone, antibiotics is not going to cure it. You know, they set up these chronic infections. And many times it won't blow up into a frank abscess because it will have a small fistula or little duct which the drainage can come out of.

In addition, Dr. Misiek testified that the later biopsies by Dr. Wine were not the source of the infection.

> Q: Were there other measures that should have been taken in removing the strut?
>
> A: Not knowing exactly what it looked like, I don't know how aggressive he got with the curettage that he did. I don't know—I know his plan was to do a [tunneling] procedure from the side to go ahead and place new HA underneath there. And that would have been fine had he not had a fistula to begin with.
>
> And his contention that Dr. Wein [sic], I guess it was, who did the two biopsies, just made the situation worse, I don't think so, because all he was doing was treating th[is] chronically inflamed tissue that was being created by whatever was underneath the strut, etc.

### *Damages*

Dr. Barrois failed to administer preoperative antibiotics to Ms. Hurt, which lead to an infection. Thereafter, Ms. Hurt saw several dentists to relieve the discomfort that was caused by the infection. Normally, the surgical site should have healed within seven to ten days. However, the infection caused the healing process to be prolonged for over one year. Therefore, it follows that Dr. Barrois is liable to

11

Ms. Hurt for the prolonged discomfort caused by the infection and the subsequent treatment that she sought to cure the infection.

Ms. Hurt suffered discomfort for over one year and incurred medical expenses as a result of the infection that was caused by Dr. Barrois' failure to administer preoperative antibiotics. We award Ms. Hurt $25,000.00 in damages and $1,920.00 in medical expenses.

*Postoperative Standard of Care*

Ms. Hurt argues that as early as one month post-surgery, Dr. Barrois identified the site of infection and identified a problem with a strut on the implant. She argues that the standard of postoperative care required Dr. Barrois to remove the strut when he did not have control over the infection.

Dr. Barksdale testified that Dr. Barrois followed the appropriate standard of postoperative care. He testified that Dr. Barrois chose the most conservative course first and then moved on to more drastic measures when the conservative corrective measures failed. His testimony regarding the postoperative standard of care is as follows:

> Q: My question is, is there a standard as far as a set time, maybe not necessarily a bright line, but a point where you say, this is the standard, as far as removing hardware, in connection with an infection?
>
> A: No, there isn't. It's just, if you can't clear it up, and in the absence of pain, you are afforded a little more time to try to get something to clear up, without eliminating struts. And it didn't appear that—she was having discomfort and not pain. So he could you know, go in and curette and try to graft and try to do those things. You know, if somebody is just in severe pain, you wouldn't wait as long to take a strut out. But what happened in the sequence and the timing would be exactly what I would follow in my own practice.

In addition, Dr. Barksdale testified that Dr. Barrois' post operative treatment of Ms. Hurt did not fall below the accepted standard of dental care.

Q: But in your opinion, he didn't breach the standard of care by the delaying of removal of the strut?

A: No. Because, again, in that period where he saw her was only a couple of months and so, to follow those first two lines of treatment or defense to try to eliminate the problem, it takes that long.

On the other hand, Dr. Dale Misiek opined that Dr. Barrois postoperative treatment fell below the standard of care. In Dr.Misiek's deposition, he stated that Dr. Barrois should have acted more quickly in removing the strut.

Q: Do you recall, from reviewing Dr. Barrois's [sic] records, that there was a curettage-

A: Curettage.

Q: Curettage?

A: Yes.

Q: -that he mentions doing in May or early June before she goes to Hawaii?

A: Yes.

Q: Was that appropriate at that point in time, or should he have done something more than that?

A: The fact that problems persisted probably indicates he should have done more. I wasn't there, so I can't tell whether that was adequate. But, see, that's just a recurring problem that she has. I mean, it just never seems to clear up. So, obviously, whatever was done was just not enough, and she still maintained a problem underneath there.

Q: Okay. We've talked about some of your opinions. With respect to your opinion that there was a failure to act quickly enough when a complication was identified, are you saying that Dr. Barrrois's [sic] treatment of Vienna Hurt in failing to act more quickly was below the required standard of care for a general dentist performing a sub[-]periosteal implant?

13

A: Yes.

Q: Okay. Are there any other areas that you feel his treatment after the surgery was below the required standard of care?

A: No.

The court was presented with two differing opinions as what the post operative standard of care was and whether Dr. Barrois breached this standard of care. "When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference." *Charpentier v. Lammico Ins. Co.*, 606 So.2d 83 (La.App. 3 Cir. 1992). After reviewing the record, we cannot say that the trial court was manifestly erroneous in finding that Dr. Barrois was not negligent in providing postoperative care to Ms. Hurt. Ms. Hurt failed to prove that Dr. Barrois failed to take proper measures to eliminate the infection. We can not say that the trial court was manifestly erroneous in choosing to believe the testimony of Dr. Barrois' witnesses as opposed to the witness presented by Ms. Hurt.

IV.

**CONCLUSION**

Although we conclude that the trial court was not manifestly erroneous in finding that Dr. Barrois did not breach the postoperative standard of care, we do find that it was manifestly erroneous in deciding that Dr. Barrois did not breach the standard of preoperative care. Therefore, Dr. Barrois is liable to Ms. Hurt for damages and medical expenses. Accordingly, the judgment of the trial court is reversed in part. Judgment is rendered in favor of Ms. Hurt in the sum of $26,920.00, consisting of $1,920.00 for medical expenses, and $25,000.00 in general damages.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED**.