EDWARD I. DANIEL, IV,
v.
KELLIE KAUFMAN DANIEL.
No. 2009 CA 1743.
Court of Appeals of Louisiana, First Circuit.
March 26, 2010.
Not Designated for Publication.
CHARLES E. GRIFFIN, II, St. Francisville, LA, Attorney for Plaintiff-Appellee, Edward I. Daniel, IV.
VINCENT A. SAFFIOTTI, Baton Rouge, LA, Attorney for Defendant-Appellant, Kellie Kaufman Daniel.
Before: WHIPPLE, HUGHES, and WELCH, JJ.
WELCH, J.
Kellie Kaufman Daniel (now "Belk") appeals a judgment of the trial court dismissing her petition to rescind the community property settlement agreement between her and Edward I. Daniel, IV, on the grounds of lesion, error, and fraud. Finding no error in the judgment of the trial court, we affirm.

I. FACTUAL AND PROCEDURAL HISTORY
Mr. Daniel and Mrs. Belk were married on January 8, 1994. Prior to their marriage, they executed an agreement whereby they agreed to accept the legal or community regime, but reserved their right to own and maintain separate property. The parties separated, and a petition for divorce was filed by Mr. Daniel on March 3, 2005. Thereafter, the parties entered into a stipulated judgment, which, among other things, prohibited both parties from alienating, encumbering, mortgaging, selling, or otherwise disposing of the community property existing between the parties, absent the written agreement of the parties. Additionally, by judgment signed on August 1, 2005, the community property regime was terminated and a separate property regime was established between the parties, retroactive to March 3, 2005. On August 16, 2005, the parties entered into a community property settlement. By judgment rendered on September 21, 2005, the parties were divorced.
Thereafter, on June 6, 2006, Mrs. Belk filed a petition to rescind the community property settlement on the basis of lesion, error, and fraud. In her petition, Mrs. Belk asserted that Mr. Daniel committed fraud in that he knowingly undervalued assets belonging to the community during settlement discussions leading up to the signing of the community property settlement, which resulted in her receiving a disproportionate share of the community assets. Alternatively, she alleged that the community property settlement should be rescinded based on a vice of consentmutual errorin that both parties undervalued the value of the community real estate and the tax liability owed by the parties such that Mrs. Belk received a disproportionate share of the community property. Mrs. Belk also asserted, in the alternative, that the community property settlement should be rescinded on the basis of lesion beyond moiety in that Mrs. Belk received less than three-eighths (3/8) of the net community property.
After a trial on the merits, on May 21, 2009, the trial court, for written reasons assigned, rendered judgment finding no evidence to support Mrs. Belk's claims of fraud, error, or lesion, and therefore, dismissed Mrs. Belk's claims against Mr. Daniel. A judgment in conformity with the trial court's ruling was signed on June 12, 2009, and it is from this judgment that Mrs. Belk has appealed.

II. ASSIGNMENT OF ERRORS
On appeal, Mrs. Belk contends that the trial court's factual determinations with regard to the value placed on the community home and the community office building at the time the parties entered into the community property settlement were manifestly erroneous, and therefore, the community property settlement should be set aside based on lesion. Mrs. Belk also contends that the trial court manifestly erred in finding that the evidence did not support Mrs. Belk's claim of error induced by fraud and in its factual determinations underlying that claimi.e., that Mr. Daniel lacked the fraudulent intent to obtain an unjust advantage or cause damage or inconvenience to Mrs. Belk.

III. STANDARD OF REVIEW
In this case, the trial court's judgment was based solely on its underlying factual findings. The correct standard of review by the appellate court for factual findings is manifest error. The two-part test for the appellate review of a trial court's factual finding is: (1) whether there is a reasonable factual basis in the record for the finding of the trier of fact; and (2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). Thus, if there is no reasonable factual basis in the record for the trier of fact's finding, no additional inquiry is necessary to conclude that there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines that the factual finding was clearly wrong. See Stobart v. State, DOTD, 617 So.2d 880, 882 (La. 1993); Moss v. State, XXXX-XXXX (La. App. 1st Cir. 8/8/08), 993 So.2d 687, 693, writ denied, 2008-2166 (La. 11/14/08), 996 So.2d 1092. Under this rule, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart, 617 So.2d at 882. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart, 617 So.2d at 882-883.
When the findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of fact, for only the fact finder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, a reviewing court may well find manifest error even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-845. Where such factors are not present, however, and a fact finder's determination is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 845. The rule that questions of credibility are for the trier of fact applies equally to the evaluation and resolution of conflicts in expert testimony. Lasyone v. Kansas City Southern Railroad, 2000-2628, p. 13 (La. 4/3/01), 786 So.2d 682, 693. A fact finder may accept or reject the opinion expressed by an expert, in whole or in part. Green v. K-Mart Corporation, 2003-2495, p. 5 (La. 5/25/04), 874 So.2d 838, 843.

IV. LAW AND DISCUSSION

A. Lesion
Louisiana Civil Code article 814 addresses rescission of a partition for lesion and provides that "[a]n extrajudicial partition may be rescinded on account of lesion if the value of the part received by a co-owner is less by more than one-fourth of the fair market value of the portion he should have received."
The proper method of establishing lesion beyond one-fourth is twofold: (1) the community property's true value (net value) must be ascertained; and (2) it must then be determined from the property acquired whether a party received value less than ¾ of ½ share of the true value of the property partitioned. McCarroll v. McCarroll, 96-2700, p. 10 (La. 10/21/97), 701 So.2d 1280, 1285. The value of the property exchanged is determined as of the date the exchange was executed. Id.
The plaintiff has the burden of proving lesion beyond one-fourth and must establish the claim by clear and convincing evidence. Baechle v. Baechle, 99-1379, p. 4 (La. App. 1st Cir. 6/23/00), 762 So.2d 1165, 1167. To prove lesion, the evidence must be clear and exceedingly strong; unsupported or speculative values are not to be considered in resolving the question of whether or not lesion exists. Id.
At the outset, we must first determine what property was included in the partition. According to the community property settlement, Mrs. Belk was not allocated any community liabilities and was allocated the following community assets: (1) the sum of $350,000.00 payable in cash or a certified check from Mr. Daniel; (2) a Merrill Lynch IRA account in the name of Kellie Kaufman Daniel; (3) a 2000 ML 430 Mercedes; (4) an option to purchase lot 155 in Amaris Isle Plantation in Grand Isle, Louisiana; and (5) all furniture, movables, and other personal items in her possession. Mr. Daniel was allocated the following community assets:[1] (1) the home (former matrimonial domicile) and property; (2) the office building and property; (3) the depot property; (4) the restaurant property; (5) the Tunica cabin; (6) the Pirates Cove property; (7) an option to purchase lot 156 in Amaris Isle Plantation in Grand Isle, Louisiana; (8) the restaurant Que Pasa; (9) the community interest in Hardwood Seedlings, L.L.P.; (10) Daniel Forestry Services, Inc.; (11) Daniel Properties, L.L.P.; (12) a Commonwealth Financial Network IRA account in the name of Edward I. Daniel, IV; (13) a Merrill Lynch investment account in the name of Edward I. Daniel, IV; and (14) all furniture, movables, and other personal items in his possession, together with a chair and ottoman in the possession of Mrs. Belk.
Additionally, Mr. Daniel assumed the following community liabilities: (1) the mortgage on the community home (former matrimonial domicile) with Wells Fargo; (2) four loans with the Bank of St. Francisville (which were in relation to the above immovable properties allocated to Mr. Daniel and to the Mercedes allocated to Mrs. Belk); (3) any and all liabilities, including tax liabilities, in the name of the companies allocated above to Mr. Daniel; and (4) any and all personal tax liabilities of the parties from the date of marriage through the date the community was terminated. Additionally, according to the community property settlement, Mr. Daniel was required to remove Mrs. Belk from all of the liabilities, within 30 days of the execution of the agreement, except with regard to the mortgage on the former matrimonial domicile; Mrs. Belk was to be removed from that liability within 120 days of the execution of the agreement.
At the beginning of trial, the parties stipulated to the values of the following assets on the date the assets were partitioned: (1) Pirates Cove property$65,000.00; (2) the 2000 ML 430 Mercedes$18,000.00; and (3) the options to purchase lots 155 and 156 in Amaris Isle Plantation in Grand Isle, Louisiana$6,000.00 each (or a total of $12,000.00).
After the trial on the merits, the trial court identified and valued the following as community assets:[2] (1) the Merrill Lynch IRA account in the name of Kellie Kaufman Daniel$4,548.41; (2) all furniture, movables, and other personal items in the possession of Mrs. Belk$32,490.00;[3] (3) the former matrimonial domicile and property$550,000.00; (4) the office building and property$161,500.00; (5) the depot property$121,500.00; (6) the restaurant property$192,000.00; (7) the Tunica cabin$62,500.00; (8) the restaurant Que Pasa$41,000.00; (9) the community interest in Hardwood Seedlings, L.L.P.$178,000.00; (12) the Commonwealth IRA account in the name of Edward I. Daniel, IV$11,318.23; (13) the Merrill Lynch investment account$55,856.64; and (14) a Merrill Lynch IRA account in the name of Edward I. Daniel, IV$38,165.05.[4] Accordingly, the trial court concluded that the total value of community assets was $1,543,878.33.
The trial court also assigned the following values to the community liabilities allocated in the settlement agreement: (1) 2004 state and federal tax liabilities of the parties$6,161.00; (2) the mortgage on the community home (former matrimonial domicile) with Wells Fargo$232,301.98; (3) loan with Bank of St. Francisville(Pirates Cove property)$56,000.00 (4) loan with Bank of St. Francisville(depot property)$117,544.78; (5) loan with Bank of St. Francisville(restaurant property)$173,017.16; (6) loan with Bank of St. Francisville(Mercedes allocated to Mrs. Belk)$10,213.23. The trial court then concluded that the total community liabilities were $595,238.15, which yielded a net community of $948,640.18, with each party being entitled to $474, 320.09.
The trial court then determined that the total net value of the community property allocated to Mrs. Belk was $411,038.41 (the Amaris Isle Plantation lot 155 option$6,000.00; the Merrill Lynch IRA in her name$4,548.41; movables$32,490.00; the Mercedes$18,000.00; and cash$350,000.00). Because the partition agreement could be rescinded on account of lesion only if the value of the part Mrs. Belk received was less by more than one-fourth of the value she should have received, and since Mrs. Belk received 86% of the value to which she was entitled ($411,038.41 is 86% of $474,320.09), the trial court determined that Mrs. Belk was not entitled to any relief based on lesion.
On appeal, Mrs. Belk does not challenge the trial court's factual determinations that the total community liabilities were $595,238.15 and that she received $411,038.41 in net community assets. Instead, she asserts that the values assigned by the trial court to two of the community assetsthe home and officewere manifestly erroneous. And if those assets are valued according to other evidence from trial, which she claims the trial court disregarded, the total value of the community assets would be much higher, the total net community to which she was entitled to would be higher, and the partition agreement would be lesionary.
As previously noted, the trial court valued the home at $550,000.00. This factual determination was based on an appraisal performed by Don Capron, an expert real estate appraiser, who appraised the value of the property as of August 9, 2005, seven days prior to the execution of the community property settlement. Mrs. Belk contends that the trial court should have valued the home according to its actual sales price approximately one-month later on September 19, 2005to a person from New Orleans immediately following Hurricane Katrinafor the sum of $840,000.00 and based on the appraisal by Ken Thornton, another expert real estate appraiser, who appraised the property on September 9, 2005, for $841,000.00 in conjunction with the September 19, 2005 sale of the home.
During trial, Mr. Thornton was questioned extensively about the discrepancy between his September 9, 2005 appraisal of the property for $841,000.00 and Mr. Capron's August 9, 2005 appraisal of the property for $550,000.00. Mr. Thornton explained that he was not asked to assess the value of the property and that the scope of his appraisal was dictated by his client, Iberia Bank, who only wanted him to find comparable sales to support the purchase price that the prospective buyer had agreed to pay. Additionally, Mr. Thornton explained that, generally, the property was probably worth more following Hurricane Katrina, and he specifically admitted that he did not know the value of the property on August 16, 2005, because he did not appraise it on that date.
After reviewing the record in its entirety, we find no error in the trial court's factual determination that, on the date the parties voluntarily partitioned the community property, the value of the former matrimonial domicile was $550,000.00. The trial court's conclusion in this regard is fully supported by the expert testimony of Mr. Capron. Although there is other evidence in the record suggesting that the home may have been worth $840,000.00, as it was sold for that sum approximately one-month later, the trial court's decision to value the home according to Mr. Capron's appraisal, particularly in light of the testimony by Mr. Thornton regarding the very limited scope of his appraisal and the general effect of Hurricane Katrina on the real estate market, was not clearly wrong.
With regard to the office property, the trial court determined that it had a value of $161,500.00. The record before us contains three separate appraisals of the community office and property which were performed by three different expert real estate appraisers. Mr. Capron performed an appraisal on August 9, 2005, and concluded that the market value of the office and property was $376,000.00. On July 7, 2008, David Wesley Moore, II performed a retrospective appraisal to determine its market value as of August 16, 2005, and concluded that its market value as of that date was $175,000.00. Additionally, on April 10, 2008, Joseph Rinaudo, Jr. performed a retrospective appraisal to determine its market value as of August 10, 2005, and concluded that its market value on that date was $148,000.00.
In determining the value of the office property, the trial court specifically stated, in its reasons for judgment, that while all of the appraisals on the office property, the depot property, the restaurant property, and the Tunica cabin were "thorough and seem supported by valid conclusions," it could not reconcile the variance between the appraisals, and therefore it chose to fix the value of those properties by averaging the competing appraisals. However, in fixing the value of the office property at $161,500.00 by averaging competing averages, it only considered and averaged the market value of the office property as presented by the appraisals of Mr. Rinaudo ($148,000.00) and Mr. Moore ($175,000.00); the trial court did not include in its average the market value of the office property as presented by Mr. Capron ($376,000.00).[5] Mrs. Belk contends that because the trial court specifically found that all of the appraisals were thorough and supported by valid conclusions, and decided to determine the market value by averaging the appraisals, it was clear error and an abuse of discretion for the trial court to only use Mr. Moore's and Mr. Rinaudo's appraised values and not include Mr. Capron's appraised value in its average.
The record before us does not disclose why the trial court did not include Mr. Capron's appraised value of the office property in calculating the average of the competing appraisals. Whether the omission of Mr. Capron's appraised value of the office property was by oversight or an implicit rejection of Mr. Capron's appraised value, the underlying factual determination reached by the trial court was clear, i.e., that the office property had a value of $161,500.00. This factual determination is supported by the expert opinion testimony of both Mr. Moore and Mr. Rinaudo. Although there was a slight variance in their two appraised values, the trial court resolved that conflict between the expert opinions by averaging the two appraised values. In light of the fact that Mr. Capron's appraised value of the office property was more than twice the appraised values of both Mr. Rinaudo and Mr. Moore, we cannot say that the trial court was clearly wrong in not including Mr. Capron's appraised value in its average of the market value or in its ultimate factual determination that the market value of the office property was $161,500.00.
Because we have found no manifest error in any of the underlying factual determinations made by the trial court with regard to the net value of the community, we further find no manifest error in the trial court's determination that Mrs. Belk received 86% of the value of the community to which she was entitled. Therefore, Mrs. Belk was not entitled to any relief based on lesion.

B. Fraud and Error
"Consent may be vitiated by error, fraud, or duress." La. C.C. art. 1948. "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. C.C. art. 1953. "Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations." La. C.C. art. 1954. "Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent." La. C.C. art. 1955. "In pleading fraud the circumstances constituting fraud ... shall be alleged with particularity." La. C.C.P. art. 856. However, "[f]raud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." La. C.C. art. 1957.
There are three basic elements to an action for fraud against a party to a contract: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause loss or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to the contract. Shelton v. Standard/700 Associates, XXXX-XXXX, p. 5 (La. 10/16/01), 798 So.2d 60, 64.
Mrs. Belk contends that Mr. Daniel's valuation of the property during the community property settlement negotiations were amounts that he knew were much lower than the actual value of those assets. She also contends that her allegations of Mr. Daniel's fraudulent conduct are supported by: Mr. Daniel's failure to disclose his intention to apply for a loan secured by the property he was to receive in the community property partition agreement, even though to encumber the property was a violation of the stipulated judgment of July 13, 2005, providing for an injunction; his failure to inform the Bank of St. Francisville that he was not the sole owner of the property securing the loan; his listing of the property after the signing of the settlement agreement for a higher value than he claimed during the negotiations; the subsequent sale of the property at the listing price; and the short period of time between the execution of the community property settlement and the listing and sale of the property. Mrs. Belk also claims that though both parties were aware that the Louisiana Department of Transportation and Development had offered $18,522.00 for a portion of community property (the office property) it was expropriating and which was partitioned in the agreement, Mr. Daniel failed to reveal that the negotiations with regard to the sum received for the expropriation were ongoing, resulting in a payment of $50,750.00 instead of $18,522.00. She also contends that Mr. Daniel misrepresented the amount of the community tax liability and failed to disclose a cash distribution he received from the community enterprise, Hardwood Seedlings, L.L.P. Mrs. Belk asserted that Mr. Daniel withheld his intention to apply to the Bank of St. Francisville for a loan to prevent her from knowing the terms of the loan, and that had she been aware of the terms of the loan, the ongoing negotiations with the Louisiana Department of Transportation and Development, the actual community tax liability, and the cash distribution, she would have been alerted to the fact that the value of the community property was higher than Mr. Daniel claimed in the negotiations.
After the trial on the merits, the trial court found that Mrs. Belk was not specifically informed by Mr. Daniel of the details of the loan he was obtaining to secure the funds necessary to satisfy both the community obligations allocated to him and the cash payment to Mrs. Belk under the terms of the community property settlement, nor was she aware that the negotiations with the Louisiana Department of Transportation and Development were ongoing or of the cash distribution to Mr. Daniel from Hardwood Seedlings, L.L.P.. Therefore, the trial court found that Mrs. Belk met her burden of proving the first element to an action for fraudthat there was a misrepresentation, suppression, or omission of true information. However, as to the second element, the trial court found that there was no intent to obtain an unjust advantage or cause damage or inconvenience. Accordingly, the trial court concluded that Mrs. Belk was not entitled to any relief based on fraud or error induced by fraud. In making the factual determination that Mr. Daniel did not have the requisite intent to obtain an unjust advantage or cause damage or inconvenience to Mrs. Belk, the trial court specifically found that Mr. Daniel's testimony as to how he arrived at the values he used during the negotiation of the community property settlement and his denial of any fraudulent intent was credible.
Based upon our review of the record, we can find no manifest error in the trial court's conclusions in this regard. As to the terms of the loan from the Bank of St. Francisville, the trial court found that Mr. Daniel did not hide the fact that he was applying for a loan secured by property that he was to receive in the partition from Mrs. Belk. Harrison Carter Leake, III, the president and CEO of the Bank of St. Francisville, handled and approved the loan to Mr. Daniel. Mr. Leake testified that he was aware that the loan to Mr. Daniel was being made in conjunction with the partition of community property and explained that the Bank was not concerned that Mr. Daniel was not the sole owner of the property securing the loan at the time Mr. Daniel applied for the loan because the Bank knew the funds were to be placed in an attorney trust account until the property securing the loan was solely in the name of Mr. Daniel.
Additionally, although Mr. Daniel testified that he was aware that an appraisal of the property was required for the loan and knew when that appraisal was performed on the property, there is no evidence in the record establishing that Mr. Daniel was aware of the results of the appraisal or the amount the property appraised for prior to the execution of the community property settlement. As to Mr. Daniel's action in encumbering the property in violation of the injunction, the trial court believed it was logical that Mr. Daniel would utilize the property he was to receive in the community property partition as security for the loan since the parties had specifically agreed that the property he was encumbering would be allocated to him. Thus, the trial court found that, although the execution of the collateral mortgage by Mr. Daniel prior to the partition may have been a technical violation of the injunction against encumbering community property, there was no harm to Mrs. Belk because Mr. Leake testified that the transaction would only be complete when Mrs. Belk accepted her portion of the community property and conveyed that to which Mr. Daniel was entitled by executing the property settlement.
With regard to Mrs. Belk's contention that Mr. Daniel knew what the community home was worth since he valued it at $487,500.00 during the negotiations, but listed it for sale six days following the execution of the community property settlement for $840,000.00, and thereafter sold it for that sum, the trial court noted that both the purchase agreement and sale of the property occurred after Hurricane Katrina. Notably, Mr. Thornton testified that there had been an increase in real estate values in West Feliciana immediately following the hurricane. The court also noted that the only evidence establishing that Mr. Daniel had knowledge that the property may have been worth more than the values considered during the negotiations was the listing agreement, which the trial court found was insufficient to prove any fraudulent intent by Mr. Daniel.
As to the ongoing negotiations with the Louisiana Department of Transportation, the evidence in the record established that, at the time of the execution of the community property settlement, the Louisiana Department of Transportation had offered the sum of $18,522.00 for the parcel in question. Although in November 2005, the Department actually paid the sum of $50,750.00 for the parcel, the record does not contain any evidence establishing that Mr. Daniel knew the final sum that would be paid when he entered into the property settlement.
Mrs. Belk also asserted that she was misled to believe that the potential income tax liability for 2004 for the parties would be approximately $60,000.00 and that this liability would be paid from the parties' Merrill Lynch investment account. She testified that in consideration of Mr. Daniel's agreement to pay the tax, she agreed that Mr. Daniel would receive the Merrill Lynch investment account as part of the community property settlement. However, she later discovered, according to their actual state and federal income tax returns, that the parties' actual income tax liability was only $6,160.00. The trial court found that Mr. Daniel did not act fraudulently in his estimation of the potential income tax of the parties to induce Mrs. Belk to convey her interest in the account because McDuffie Herrod, the parties' certified public account, testified that he had estimated the potential income tax liability of the parties to be that which was represented by Mr. Daniel. Thus, the trial court concluded that during the settlement negotiations, Mr. Daniel was only repeating that which his accountant had advised him.
Lastly, with regard to the distribution from Hardwood Seedlings, L.L.P., the testimony established that annual distributions were made from that enterprise and Mrs. Belk was aware of that fact because she was the bookkeeper for that enterprise.
Although Mrs. Belk was not specifically informed of certain actions taken by Mr. Daniel, the trial court's conclusion that there was no intent to obtain an unjust advantage or cause loss or inconvenience to Mrs. Belk is supported by the record. Although it appears that Mr. Daniel obtained an advantageous settlement, his actions to obtain this settlement did not rise to the level of fraud. He offered plausible explanations for all of his actions during the negotiations of the settlement, which the trial court found credible. We also note that during the negotiations for the property settlement, Mr. Daniel's settlement offers also included a reverse situationwhere Mrs. Belk would receive all of the assets and liabilities which were allocated to him and Mr. Daniel would receive the cash settlementwhich belies any intent by Mr. Daniel to gain an unjust advantage or cause damage or inconvenience to Mrs. Belk. Furthermore, we also find no evidence in the record affirmatively establishing that Mrs. Belk relied on or was induced to rely on any assertion by Mr. Daniel during the settlement negotiations.
Accordingly, as we have found no manifest error in any of the underlying factual determinations made by the trial court with regard to Mrs. Belk's claim of fraud, Mrs. Belk was not entitled to any relief based on fraud or error induced by fraud.

V. CONCLUSION
For all of the above and foregoing reasons, the June 12, 2009 judgment of the trial court dismissing Mrs. Belk's action against Mr. Daniel to rescind the parties' community property settlement based on lesion, error, and fraud is affirmed.
All costs of this appeal are assessed to the appellant, Kellie Kaufman Belk.
AFFIRMED.
WHIPPLE, J., concurring.
Although I find the extremely short time between the partition agreement and Mr. Daniel's ability to list and sell the home and property at a significantly higher amount than the value assigned in the partition to be very troubling and suspicious, and to raise serious issues regarding Mr. Daniel's credibility and his intent to deceive Mrs. Daniel, I am compelled to concur in the result reached by the majority, given the standard of review applicable herein and the absence of some clear testimony or evidence showing precisely when Mr. Daniel negotiated the terms of the sale and listing of the property at issue to the buyer herein. In sum, absent some clear evidence establishing Mr. Daniel had entered into these negotiations with a willing buyer before the compromise partition was signed, the result is correct.
NOTES
[1] For the sake of brevity, we have not included the legal description of the immovable property allocated to Mr. Daniel, but instead refer to the properties in the manner the parties have referred to the properties throughout the record in this matter.
[2] We note that the trial court did not identify as community or assign a value to either Daniel Forestry Services, Inc. or Daniel Properties, L.L.P. The evidence at trial indicated that Daniel Forestry Services, Inc. was Mr. Daniel's separate property and that Daniel Properties, L.L.P. was a holding entity, holding title to the various immovable properties owned by the parties and allocated in the partition agreement to Mr. Daniel.
[3] The trial court noted that Mr. Daniel also received some movable property, but there was insufficient evidence offered at trial to place a value on those assets.
[4] We note that this Merrill Lynch IRA account was not included as an asset that was partitioned in the community property settlement, and the record does not disclose the reason for its absence from the partition agreement. Although it was appropriate for the trial court to consider this asset in determining the net value of the community for purposes of determining whether the partition agreement was lesionary, we note that its exclusion or omission from the community property settlement may be grounds for a supplemental partition. See Edwards v. Edwards, 35,953, 35,954, p. 3 (La. App. 2nd Cir. 5/8/02), 817 So.2d 414, 416; Sullivan v. Sullivan, 42,923, p. 9 (La. App. 2nd Cir. 2/13/08). 976 So.2d 329, 336, writ denied. XXXX-XXXX (La. 6/6/08), 983 So.2d 921.
[5] ($148,000.00 + $175,000.00) ÷ 2 = $161,500.00. Notably, had the average of the market values of the office property included Mr. Capron's appraised market value of $376,000.00, the average of the market values would have been $233,000.00 ($148,000.00 + $175,000.00 + $376,000.00) ÷ 3 = $233,000.00.