505 So.2d 1120 (1987)
Raymond J. MART
v.
James E. HILL, et al.
Nos. 86-C-2191, 86-C-2200.
Supreme Court of Louisiana.
April 16, 1987.
Rehearing Denied May 28, 1987.
*1121 Herman L. Bastian, Jr., Law Office of Milton LeBlanc, New Orleans, for intervenor.
Dominic J. Gianna, Deborah D. Cunningham, Hammett, Leake & Hammett, New Orleans, for defendants.
A. Remy Fransen, Jr., C. Scott Carter, Wiedemann & Fransen, New Orleans, John J. McKeithen, Russell A. Woodard, McKeithen, Wear, Ryland & Woodard, Columbia, for plaintiff.
CALOGERO, Justice.
This litigation arose out of an accident which occurred on October 19, 1981, at approximately 7:30 p.m. just inside the Jefferson Parish line (from New Orleans) in the westbound (inside) paved shoulder of Interstate Highway 10, on the descending portion of the Oaklawn overpass. The plaintiff, Raymond J. Mart, allegedly sustained serious and disabling back injuries after his 1980 Toyota pick-up truck was rear-ended by a loaded tractor-trailer owned and operated by defendant James E. Hill.
Mart filed a petition for damages in the Civil District Court for the Parish of Orleans, naming as defendants Hill, Intracoastal Truck Lines, Inc. (the lessee of the tractor-trailer and the employer of Hill),[1] and North River Insurance Company and International Surplus Lines Insurance Company (the insurers of Intracoastal Truck Lines, Inc.).[2] Pursuant to the provisions of La.Rev.Stat.Ann. 13:1171 (West 1987), the lawsuit was transferred to a Commissioner of the Civil District Court. After trial the Commissioner rendered a Report, Recommendation for Judgment, and Proposed Judgment. In the report the Commissioner found that plaintiff Mart and defendant Hill were each negligent, the accident having been caused 50% by each. The Commissioner found further that Mart sustained no disability beyond that incident to a three month lumbosacral strain and that Mart failed to prove by a preponderance of the credible evidence that the surgeries performed and the medical treatment rendered after January, 1982, were related to the accident of October 19, 1981. The Commissioner accordingly recommended a total damage award of $18,760.00 which, of course, was subject to the 50% reduction.[3] A judgment which adopted the Commissioner's recommendations was thereafter signed by the Judge of Division K of the Civil District Court.
Plaintiff Mart and the compensation intervenor, National Union Fire Insurance Company, appealed. The Fourth Circuit Court of Appeal affirmed the trial court judgment. 496 So.2d 1149 (La.App.1986). We granted a Writ of Certiorari.
Because we find that the lower courts were clearly wrong in their percentage allocation of fault, in their assessment that Mart sustained no disability beyond that incident to a three month lumbosacral strain as a result of the accident, and in their assessment that Mart failed to prove by a preponderance of the credible evidence that the surgeries performed and the medical treatment rendered after January, 1982, were related to the accident of October 19, 1981, we reverse the lower court judgments and remand the case to the court of appeal for a determination concerning the appropriate amount of monetary judgment to be awarded plaintiff, all in accordance with this opinion.

The Accident
On October 19, 1981, Raymond J. Mart was employed by Bosun Diesel. He had spent the day working at Bluestreak Industries in Chalmette, Louisiana. After finishing the day's work, Mart left for his home in Kenner. He headed west on I-610 until the highway merged with I-10 near the Orleans-Jefferson line. At that point Mart *1122 noticed that the tractor-trailer driven by Hill was "somewhat" behind him.[4] Before he reached the Oaklawn overpass, Mart had moved further to the left, into the inside lane of Interstate 10. As Mart crested the top of the Oaklawn overpass, he observed flashing lights at the bottom of the overpass, and he noticed that traffic was backing up onto the descending portion of the overpass. Mart testified that he would have been able to stop his vehicle with little difficulty behind the vehicle immediately in front of him in his then left traffic lane. However, because he had noticed Hill's tractor-trailer behind him and was concerned about its ability to stop, he moved left to the paved interior shoulder of the Interstate which paralleled the left hand traffic lane. Mart did not look in his mirror before moving to the shoulder. Once on the paved shoulder, he stopped his vehicle with his front bumper aligned with the rear bumper of the last vehicle in line in the left traffic lane. Although Mart testified there was nothing blocking the left shoulder of the road onto which he had proceeded,[5] he stopped his vehicle because he thought it was illegal to drive on the shoulder.[6]
Defendant's version of the events leading up to the accident was somewhat different from that offered by Mart. As Hill and his tractor-trailer crested the Oaklawn overpass, he viewed the same scene on the overpass' descent as had confronted Mart. At the time Hill was travelling approximately 50 to 55 miles per hour in his fully loaded tractor-trailer. According to Hill, he knew something had to be done if he was to avoid hitting the cars in front of him. Hill then maneuvered his truck onto the left (internal) paved shoulder of the highway. As he was moving the tractortrailer left to the shoulder, he saw Mart's Toyota pull out of the left lane of travel, onto the shoulder, and into his path, where it then stopped. According to Hill, Mart's Toyota was not the last car in the line of traffic, but was rather the third or fourth car from the end of the stalled line of traffic.
Hill's tractor-trailer then rear-ended the Toyota. After the collision, the witness, Irwin J. LaVergne (see supra note 5) saw the Toyota veer off left onto a grassy median area of the Interstate before it came to a stop.

Allocation of Fault
We have characterized "duty-risk" analysis as the process to be employed in determining whether liability exists under the facts of a given case. In making the requisite analysis four questions are to be considered:
(1) Was the conduct in question a causein-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970); Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976); Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
The negligence of the following driver, Hill, in this rear-end collision, hardly needs extensive discussion or analysis. The liability of a rear-ending driver has been defined and clarified in a plethora of Louisiana decisions. The duty owed by Hill has been statutorily set out in La.Rev. *1123 Stat.Ann. § 32:81 (West 1963) which provides, in pertinent part:
The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway.
Louisiana courts have uniformily held that a following motorist in a rear-end collision is presumed to have breached the standard of conduct prescribed in La.Rev.Stat.Ann. 32:81 and hence is presumed negligent. See, e.g., Eubanks v. Brasseal, 310 So.2d 550, 553 (La.1975); Prest v. State Dept. of Transp., 490 So.2d 659 (La.App. 2d Cir.); writ denied, 494 So.2d 328 (La.1986); Lewis v. Variste, 422 So.2d 222 (La.App. 4th Cir.1982). We also note that the risk of a rear-end collision (whether the collision occurs in an emergency lane, or in a travelled portion of a roadway) is clearly within the scope of the statutory prohibition against following too close.
Hill's conduct was indeed a cause in fact of the resulting harm: he breached a duty he owed to the plaintiff Mart and others, and both the risk and the harm caused were within the scope of protection afforded by the duty breached.
Turning to an analysis of Mart's conduct, we find the Commissioner was correct in finding that Mart's conduct contributed to the accident. Mart admittedly did not look in his mirrors before moving to the emergency lane, or shoulder. Mart's inadvertence or neglect in this regard was a causein-fact of the accident. If Mart had looked he would have seen the tractor-trailer moving to the shoulder, and he would surely have stayed in his left lane of travel and this accident would thereby have been averted.[7] Mart admittedly breached the general duty owed by all motorists to observe what should be observed. Accordingly, we find Mart's negligence contributed to the accident.
Having found both parties negligent, we turn to the matter of apportionment of fault. In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La. 1985), we looked to the Uniform Comparative Fault Act, § 2(b) and Comments (as revised in 1979) for guidelines in apportioning comparative fault. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed.
Watson, 469 So.2d at 974.
We also noted in Watson that a variety of other factors may influence the respective degrees of fault:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Id.
In Turner v. New Orleans Public Service, Inc., 476 So.2d 800, 805 (La.1985) (Justice *1124 Lemmon, concurring), Justice Lemmon noted that proportionate percentages of fault should be based on considerations of the parties' respective degrees of duty, and causation.
Our analysis of the foregoing factors indicates that Hill's conduct was, by far, the more egregious. Hill admitted that he was travelling 50-55 miles per hour as he approached the overpass. He further testified that his tractor-trailer was fully loaded, weighed approximately 77,000 pounds, and required approximately 350 feet of stopping distance. When Hill reached the crest of the overpass, there was approximately 60 feet between his truck and the immediately preceding vehicle.[8] Hill, as an experienced driver, had to be aware of the serious danger created by the weight of his tractor-trailer, his speed, and the reduced vision as he ascended the Oaklawn overpass. Given these factors, the duty Hill owed to Mart (and the motoring public) was much greater than the duty owed by Mart under these circumstances.
The weighing of risks in this case also dictates that a much greater degree of fault be allocated to Hill. Hill's conduct placed not only Mart, but the motoring public, at risk of serious injury. Had Hill stayed in his lane of travel, he admittedly would have rear-ended the vehicle immediately preceding him. As it turned out, it was fortunate that Hill only injured the plaintiff, for he might have caused a chainreaction collision and even more damage and injury, had he stayed in the same lane of travel. In Turner, we noted that "the greater the risk of harm to others, the greater is the fault." Id.
Mart's fault, on the other hand, while it did contribute to the accident, was much less significant than Hill's. Mart simply moved to the emergency lane without checking his mirror, and placed himself in Hill's path.
In short, we find that the percentage allocation of fault in this case was clearly wrong. After weighing all factors involved in this accident, we assign 10% of the fault (rather than 50%) to Mart. Defendant Hill is accordingly assessed with 90% of the requisite fault.

Subsequent Medical Treatment and its Relationship to the Accident
According to the Commissioner, plaintiff proved that he had suffered a lumbosacral strain of approximately three months' duration. He then recommended that Mart be awarded $10,000.00 in general damages and $8,760.00 in lost wages, the foregoing subject to a 50% reduction. The Commissioner awarded no damages of any sort for consequences of the accident beyond January, 1982, since he felt the plaintiff did not prove that his surgeries (which included exploratory surgery, a discectomy, and a spinal fusion) and disability were causally related to the accident of October, 1981. That conclusion, we find, was clearly wrong.
Mart's initial treating physician was Dr. Wilmot Ploger, an orthopedic surgeon. Dr. Ploger felt that Mart had sustained an injury to the cervical and lumbar spine as a result of the accident of October, 1981. Mart related no history of prior back difficulties to Dr. Ploger, who treated Mart for his back problems from October 20, 1981 (the day after the accident), until his discharge on January 26, 1982. Although Mart was still complaining of occasional stiffness in his lower back on that date, Dr. Ploger felt Mart could return to work.
Mart returned to work in January, 1982. According to him, the work at Bosun Diesel was lighter in the winter months. When the work picked up, Mart found that his back discomfort was increasing. Dr. Ploger noted that persons with back problems such as Mart's often have increased symptoms concurrent with increased activity. In fact, Dr. Ploger noted that additional surgery, including a spinal fusion, frequently occurs in cases similar to Mart's. Dr. Ploger testified unequivocally that the *1125 accident in question was the cause of the symptoms evidenced by Mart.
The plaintiff's family physician, Dr. Edmond Mickal, had cared for the then 36 year old plaintiff from the time that he was four years old. During this entire period, Dr. Mickal testified, Mart had never had any back complaints or disability.[9] During the three month interval between plaintiff's accident and his return to work, Dr. Mickal was treating Mr. Mart for his back problems concurrently with the treatment offered by Dr. Ploger.
After plaintiff returned to work on January 18, 1982, Dr. Mickal twice had occasion to take Mart's blood pressure (on April 16, 1982 and June 15, 1982). On both occasions, Mart complained of backaches in the lumbar area when the weather was cold or damp. These complaints were consistent with the prior complaints Mart had made to Dr. Ploger.
As his work activities increased in the spring of 1982, Mart experienced increasing difficulty with his back. On July 16, 1982, he was examined by Dr. William Pusateri, an orthopedic surgeon. Dr. Pusateri initially detected tenderness in Mart's left paravertebral musculature and a positive straight leg raising test.[10] His initial diagnosis was that Mart had a chronic lumbar strain. As the plaintiff's pain had not diminished by the time of his second visit, Dr. Pusateri advised Mart to discontinue working and to begin physical therapy. At this time, approximately nine months had passed since the accident.
When Mart continued to complain of pain, he was admitted to Mercy Hospital for diagnostic tests. Lumbar myelogram and electromyogram (EMG) tests[11] were negative.[12] By September 10, 1982, however, Dr. Pusateri was observing a positive bilateral straight leg raising test. Given the patient's history, Dr. Pusateri felt a reasonable explanation of Mart's difficulties was the accident of October 19, 1981.[13]
Dr. Pusateri referred the plaintiff to Dr. Bert Bratton, a neurosurgeon. Dr. Bratton had another EMG performed on October 21, 1982. He also scheduled a CT scan of Mart's back. The EMG indicated the presence of nerve lesions in Mart's back.[14] The CT scan[15] of Mr. Mart's lower back was interpreted by a Dr. Yellin. The CT scan indicated, inter alia, the presence of bulging discs at the L5-S1 and L4-5 level. As a result of these tests, Dr. Bratton concluded that exploratory surgery was necessary.
Dr. Bratton then proceeded to perform a partial laminotomy and foraminotomy.[16] The exploratory surgery did not indicate the presence of a ruptured disc. He did conclude, however, that Mart had sustained internal damage to the nerve roots of his *1126 back.[17] Given the history offered by plaintiff, Dr. Bratton concluded that the accident of October 19, 1981, was the probable cause of the protracted problems with his back.
When Mart's post-operative pain continued, he was referred to Dr. Donald Richardson's pain clinic at the Hotel Dieu Hospital in New Orleans.[18] A radiologist at Hotel Dieu, Dr. Mario Calonje, performed another CT scan on plaintiff's back. The test indicated the presence of a bulging disc at L5-S1, and, to a lesser degree, at the L4-5 level. This test confirmed the prior findings of Dr. Yellin.
Dr. Richardson's initial impression of Mart was that he had a "failed back syndrome with hysterical symptoms." The prior medical history of plaintiff was consistent with potential pathology in the lumbar spine area. Dr. Richardson testified that "malingerers," or persons who are faking a syndrome of pain, are not admitted to the clinic if such is recognized.
While at the clinic, Mart was examined by psychiatrists who worked at the clinic. The psychiatrists found that Mart was suffering from traumatic neurosis, according to Dr. Richardson, who also testified Mart had a passive, dependent personality. Although Dr. Richardson was somewhat critical of Mart's complaints of pain,[19] he admitted that Mart tried to cooperate with those working with him at the clinic. Dr. Richardson also admitted that persons afflicted with traumatic neurosis suffer from real pain. Given this scenario, Dr. Richardson admitted that such a person could be both emotionally and physically disabled.[20]
Upon his release from the pain clinic, Mart was advised to seek psychiatric help. He was thereupon examined by Dr. C.B. Scrignar, a psychiatrist. Dr. Scrignar testified that there are two concurrent elements of pain involved in injuries such as that sustained by Mart: the actual physical injury and the psychological injury characterized as posttraumatic stress disorder. In such cases, the physical and psychological pain run parallel to each other in the aftermath of an accident.[21] Dr. Scrignar testified that as a psychiatrist, he is trained to ferret out and recognize malingerers, and that Mart was not such a person. The plaintiff's complaints were sincere and the pain syndrome was real, according to him.[22]
On August 22, 1983, Mart was examined by Dr. Walter Brent, an orthopedic surgeon who examined the plaintiff on behalf of National Union Fire Insurance Company, the intervenor compensation insurer. Dr. Brent noted a variety of physical difficulties which were consistent with pathology in the lumbar spine and with nerve root irritation. He reviewed the CT scan taken on March 3, 1983, by Dr. Calonje. Dr. Brent agreed that the CT scan verified nerve root pathology.[23] According to this witness, Mart was disabled and could not return to work as of the date of that examination, August 22, 1983. Further, given the patient's history, Dr. Brent testified that the symptoms he observed in Mart were caused by the accident of October 19, 1981.
When the plaintiff failed to improve following his treatment at Hotel Dieu's Pain *1127 Clinic, Mart was referred to Dr. Carlos Pisarello, a neurosurgeon. Dr. Pisarello reviewed the prior medical history, which indicated the presence of prolapsed discs in Mart's back. Dr. Pisarello then fitted Mr. Mart with a back brace. The brace is utilized to stabilize the spine. If the brace alleviates the pain, the chances of a spinal fusion's benefitting the patient are increased. Mart thereafter reported that use of a brace had alleviated his pain.
On January 12, 1984, Dr. Pisarello, together with Dr. Truman Kerr, performed a spinal fusion and discectomy. Dr. Pisarello examined Mart's discs and determined that L4-5 and L5-S1 were prolapsed and degenerated. These two prolapsed discs, together with the presence of scar tissue from the prior surgery, necessitated the discectomy and spinal fusion.[24] Dr. Pisarello then testified that even in the best possible scenario, Mart would be left with significant disabilities, including a limitation on his pushing or lifting heavy objects. Mart would not be able to return to his former position of diesel mechanic.[25] Finally, Dr. Pisarello testified that the cause of Mart's medical difficulties was the accident of October 19, 1981.[26]

Standard of Review
Appellate courts may not disturb the fact findings of the trier of fact in the absence of manifest error. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1979). In Arceneaux, we posited a two part test for the appellate review of facts:
1) The appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and
2) The appellate court must further determine that the record establishes that the finding is not clearly wrong (manifestly erroneous).
Arceneaux, 365 So.2d at 1333; B and L Associates, Inc. v. Crump, 369 So.2d 1094, 1095 (La.App. 1st Cir.1979).
Accordingly, if an appellate court concludes that the trial court's factual findings are clearly wrong, the mere fact that some record evidence appears which would furnish a reasonable factual basis for the contested findings does not require affirmance. Davis v. Owen, 368 So.2d 1052, 1056 (La.1979). Although appellate courts must accord great weight to the factual findings of the trial judge, these same courts have a duty to determine if the fact finder was justified in his conclusions. See, e.g., Parker v. Rhodes, 260 So.2d 706, 717 (La.App. 2d Cir.1972). An appellate court is not required, because of the foregoing principles of appellate review, to affirm the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles. West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979).
Our review of the record indicates that the Commissioner was clearly wrong in finding that plaintiff's back difficulties beyond a simple lumbosacral strain of three month's duration were not caused by the October 19, 1981 accident, and that plaintiff suffered no disability, other than a three month lumbosacral strain, as a result of the accident. In a personal injury lawsuit, *1128 the test for determining the causal relationship between the accident and subsequent operations is whether the plaintiff proved through medical testimony that it was more probable than not that subsequent operations were caused by trauma suffered in the accident. Villavaso v. State Farm Mut. Auto Ins. Co., 424 So.2d 536, 538 (La.App. 4th Cir.1982). As we have discussed, virtually all of the record testimony indicates that Mart's back problems were caused by the automobile accident of 1981. Further, there was no evidence introduced which indicates that Mart had suffered back troubles prior to the accident, or that Mr. Mart's difficulties were precipitated by an intervening cause.[27] Lawsuits cannot be decided on speculation or suspicion alone. Accord, Miller v. Miller, 226 La. 273, 76 So.2d 3, 4 (1954). Accordingly, we find the plaintiff proved that his medical treatment and resulting disability were causally related to the accident of October 19, 1981.[28]

Quantum
At the outset, we note that this case is not fully governed by the principles set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). In Coco, the issue before us was the court of appeal's substantial reduction of a jury award. There was no issue, as there is in this case, as to whether subsequent medical intervention and the resultant disability suffered by the plaintiff were related to the tortious conduct of the defendant. We first noted in Coco that the trier of fact has "much discretion" in awarding damages. We ultimately held that when an appellate court finds that the lower court abused this discretion, the appellate court may only raise or lower the award to the highest (or lowest) point which is reasonably within the discretion of that court. The Coco principle of appellate review applies when an appellant questions the adequacy of a monetary award in a case which is otherwise uncomplicated by factual errors relating to the cause or duration of the plaintiff's disability.
In this case, the Commissioner found the plaintiff had suffered simply a three month lumbosacral strain. Consequently, no damages for lost wages, pain and suffering, and medical expenses (including the aforementioned surgical procedures) were awarded for the period after the plaintiff's return to work in January, 1982. As we have discussed, this finding was clearly wrong and resulted in a monetary award which incorrectly did not take into account the nature of plaintiff's injuries and the extent of his disability. The principles espoused in Coco do not apply in this case, since there was no award made for consequences of the accident past January, 1982, for the appellate court to review. Simply stated, Coco applies when an appellate court is asked to correct a fact finder's abuse of discretion in assessing the appropriate monetary award for a given injury. The principles are not applicable when a res nova review of quantum must be made to compensate a plaintiff for damages which the trial court did not believe were causally related to the accident. See, Jackson v. United States Fidelity and Guaranty Company, 382 So.2d 223, 230 (La. App. 3d Cir.), writ denied, 385 So.2d 275 (La.1980); Cf., Rodriguez v. Traylor, 481 So.2d 1017 (La.1986) In Rodriguez, we held that when a jury has been erroneously *1129 instructed on the issue of quantum so that it is necessary for the reviewing court to set aside the award, the appellate court should fix the damages on the basis of an independent evaluation of the record, rather than simply increasing the award to the lowest reasonable amount. We therefore remand this case to the court of appeal, for a res nova determination of the appropriate total amount of damages to be awarded to the plaintiff for the injuries and disability he sustained.[29]

Decree
Accordingly, the judgments of the district court and the court of appeal are reversed. The case is remanded to the court of appeal for a redetermination of the amount of the damage award, taking into account that plaintiff has satisfactorily proved that his back surgeries and attendant disability were caused by the accident, and consistent with the percentage allocation of fault recited hereinabove.
REVERSED AND REMANDED.
COLE, J., concurs and assigns reasons.
DIXON, C.J., dissents with reasons.
COLE, Justice, concurring.
Defendant Hill admits he had to take evasive action to avoid hitting the cars in front of him. This situation was created by his negligent conduct in driving too fast and following too closely. His causative fault is premised upon a failure to take into consideration the difficulty in maintaining control of a heavily loaded tractor-trailer in congested traffic, while traveling at a speed of 50 to 55 miles per hour. The plaintiff was stopped in a place intended for such usage. If defendant Hill had not moved over onto the shoulder and struck plaintiff's vehicle, he would have rear-ended the vehicle in his lane of traffic. Either way, it was Hill's pre-existing conduct which made an accident inevitable. As regards fault on the plaintiff's part, I cannot disagree with the minimal ten percent attributed to him. The apportionment of fault at ninety percentten percent is realistic and comports with the duty of every driver to be alert and aware of all circumstances attendant to safe driving.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
I can find no fault on the part of Mart, and overwhelming fault on the part of defendant Hill. Mart's actions were prudent and lawful. He was stopped in a place where he was entitled to be (on the emergency lane of a divided-pavement interstate highway) when he was struck from the rear by a truck loaded with over thirtyeight tons of pipe, traveling so fast that it couldn't be stopped before colliding with whatever was in front of it. This was the proximate cause, the legal cause, the factual cause and only cause of the accident.
NOTES
[1] Evidently, Hill had leased his truck to Intracoastal at some point prior to the accident.
[2] A petition of intervention was subsequently filed by National Union Fire Insurance Company, the compensation insurer of Bosun Diesel, Inc.
[3] The Commissioner also recommended that each party bear its own costs, including expert witness fees. The claim of National Union Fire Insurance Company was limited to reimbursement of $2,448.00 in compensation payments and $285.00 in medical payments.
[4] The tractor-trailer was loaded with pipe and weighed approximately 77,000 pounds.
[5] Mr. Irwin J. LaVergne, an employee of the Orleans Parish Sheriff's Office, testified at the trial. Mr. LaVergne was on his way home in a Sheriff's Department vehicle when he noticed the original accident at the bottom of the overpass. He stopped his vehicle approximately ten feet from the initial accident scene in order to render assistance to any injured passengers. He also turned on the bubble light atop his vehicle, presumably to warn following vehicles. LaVergne testified that one of the cars in the initial accident just up ahead was partially blocking the left shoulder of the highway.
[6] Mart also testified he was concerned that vehicles in front of him might open their doors as he progressed further down the shoulder.
[7] At this point, we choose to restate the differing versions of the accident. Hill testified that Mart was not the last car in line, but rather, was the third or fourth vehicle from the end of the traffic line. And he said that as he moved to the shoulder, Mart did so too. If Hill's version is correct, Mart's purported reason for pulling to the shoulder (to give the tractor-trailer more room) appears suspect. The Commissioner evidently believed Hill's version of the facts. The ultimate reasons for Mart's move to the shoulder, however, does not affect our disposition of this case regarding the allocation of fault. Whatever reason Mart had for moving to the shoulder, that movement (without first assuring that it could be done safely) and his abrupt stop without taking note of the approaching tractortrailer, was, to an extent, a negligent act which contributed to the accident.
[8] Although Hill's testimony is somewhat unclear on this issue, the thrust of his testimony was that the short distance between his vehicle and the immediately preceding vehicle made a collision inevitable.
[9] Of course plaintiff also testified that he had had no back problems prior to the accident of October 19, 1981.
[10] A straight leg raising test can authenticate the truthfulness of a patient's subjective complaints. That presupposes the patient has not been tutored on the "preferred" responses, according to Dr. Pusateri.
[11] A myelogram is an x-ray visualization of the spinal cord following an injection of a radiopaque substance. An electromyogram measures the electrical discharge of contracting muscular fibers and is used to detect evidence of nerve damage.
[12] Such a finding was not unusual, according to Dr. Pusateri, for he testified that it is not uncommon for a patient to undergo treatment for up to two years before a definitive diagnosis of nerve root pathology is made.
[13] Dr. Pusateri also agreed with Dr. Ploger that increased work activities can lead to increasing symptoms of back problems arising from an initial traumatic incident.
[14] Dr. Bratton testified that an EMG is an objective test which cannot be "altered" by the patient or the physician. In this case, the EMG indicated chronic nerve damage.
[15] Computerized Tomography (CT) is a diagnostic technique whereby a cross-sectional view of an anatomical area is obtained. The technique is used in diagnosing disc disorders, among many other purposes.
[16] In a laminotomy, a portion of the laminae (bony portion of the neural arch) is removed. This procedure aids physicians in visualizing the nerve root, among other benefits. In a foraminotomy, the bone aperture through which the nerves pass is enlarged.
[17] Dr. Bratton concluded that the nerve damage he noted can result in chronic pain, which may be alleviated but not eliminated.
[18] The pain clinic provides therapy for patients with chronic pain who do not respond to the usual forms of pain therapy.
[19] Richardson's treatment was rendered prior to the surgery performed by Drs. Pisarello and Kerr, to which reference is made hereafter.
[20] Given the patient's symptoms and history, Dr. Richardson also opined the October, 1981, accident precipitated the plaintiff's difficulties.
[21] The amount of pain involved in the separate injury elements are impossible to distinguish, according to Dr. Scrignar.
[22] The testimony offered by Dr. Scrignar was unrebutted by the defense. They called no psychiatric experts.
[23] Dr. Brent also discussed arthritic changes he noted in the lumbar facet joint. This condition, in and of itself, he stated, could have caused the pain experienced by Mart. Although Dr. Brent noted the arthritis he found was longstanding, Dr. Brent testified it is common that trauma to the back could have exacerbated a pre-existing condition which was previously asymptomatic.
[24] Dr. Pisarello also addressed the prior seemingly inconsistent finding by Dr. Bratton, in which Dr. Bratton, during the course of exploratory surgery, found no bulging discs. The horizontal positioning of Mart during the surgical procedure and the anesthesia administered in that surgery may have caused the non-bulging of Mart's discs during the first surgery. According to Dr. Pisarello, this does not negate the fact that the discs would have bulged under normal conditions.
[25] Dr. Pisarello did testify that approximately 85% of patients who have undergone surgery similar to that of Mart are able to return to some sort of gainful employment.
[26] Dr. Truman Kerr, an orthopedic surgeon who performed the discectomy and spinal fusion with Dr. Pisarello, also testified. For the most part, his testimony reinforced that of Dr. Pisarello. He did note, however, that assuming the second surgery was successful, Mart would have at least a 25% functional disability of the body as a whole.
[27] We note that the Commissioner quoted from the testimony of Dr. Pusateri to the effect that Mart's back had become more painful when he had "lifted a lot of heavy engines." We find the quoted testimony does not evidence an intervening cause of Mr. Mart's injuries. In the history given to Dr. Pusateri by Mr. Mart, the plaintiff specifically mentioned the accident as immediately preceding the onset of his difficulties. When the work load in his job increased (i.e., he was lifting heavier engines) his back became more painful. This testimony also overlooks Dr. Pusateri's testimony that the automobile accident was a reasonable cause of the plaintiff's disability.
[28] Implicit in this finding is our view that the plaintiff sustained a disability as a result of the accident in question. As we have noted, virtually all of the testimony offered in this case indicates that the operations performed on the plaintiff were causally related to the 1981 accident. Both Drs. Pisarello and Kerr testified that the plaintiff would be disabled from performing certain work as a result of the surgeries. This testimony was unrebutted at trial.
[29] The intervenor is also entitled to an appropriate increase in its judgment relative to reimbursement for compensation and medical expenses.