# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-246

WILSON JOLIVETTE

VERSUS

RAY HEBERT, ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 123073
HONORABLE EDWARD LEONARD, JR., DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and D. Kent Savoie, Judges.

**AFFIRMED AS AMENDED.**

Jerry J. Falgoust
Falgoust and Caviness, LLP
P.O. Box 1450
Opelousas, LA 70571-1450
(337) 942-5812
COUNSEL FOR PLAINTIFF/APPELLANT:
    Wilson Jolivette

**George R. Privat**
**Tucker F. Giles**
**Michael M. Thompson**
**Law Offices of Keith S. Giardina**
**9100 Bluebonnet Centre Boulevard, Suite 300**
**Baton Rouge, LA 70809**
**(225) 293-7272**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Peerless Insurance Company**
    **Ray Hebert**
    **Hangariff's Machine Shop, Inc.**

**GREMILLION, Judge.**

The plaintiff, Wilson Jolivette, appeals the jury's determination that he was 70% at fault in a pedestrian/truck accident. He further appeals the jury's award of $56,000 in damages. Defendants, Ray Hebert, Hanagriff's Machine Shop, Inc., and Peerless Insurance Company, filed a brief in April 2016, urging that the jury erred in assigning fault to Ray Hebert. Additionally, in June 2016, the defendants filed a brief arguing that the jury did not commit manifest error in its damage awards. For the following reasons, we affirm as amended.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 9, 2012, Jolivette departed his employment at Valerus in New Iberia, Louisiana, on foot and attempted to cross the frontage road adjacent to Louisiana Highway 90 to await the arrival of his nephew, Milton Prejean, who sometimes brought Jolivette to and from work. Hebert, who was employed by Hanagriff's Machine Shop, Inc., was driving his employer's 2005 two-ton International flatbed diesel-engine truck. Jolivette's right hand collided with the driver's side mirror of the truck operated by Hebert, causing Jolivette to spin. Jolivette fractured his wrist and his left ankle.

Jolivette filed a petition for damages in August 2013. Following a two-day jury trial in July 2015, the jury found Hebert 30% at fault and Jolivette 70% at fault in causing the accident. The jury awarded Jolivette $10,000 for physical pain and suffering, past and future, $36,000 for past medical expenses, and $8,600 for past loss of earnings, for a total of $54,600 in damages. Jolivette assigns as error the jury's assessment of fault and general and special damage awards. Hebert assigns as error the allocation of 30% fault to him.

# DISCUSSION

## *Testimony*

Hebert testified that he has been employed with Hanagriff's Machine Shop for thirty-nine years. Hebert said that on the day of the accident he had delivered some parts and was returning to the plant in Centerville, Louisiana. He said the International truck that he was operating was white, approximately thirty-five feet long, and nine feet tall. He was familiar with the route and had traveled it before. He said that it was a sunny, clear day at around 4:00 p.m. when the accident occurred. Hebert was on the service road adjacent to Louisiana Highway 90. The roadway was dry and straight and there was no traffic that obscured or blocked his vision. Hebert said he does have a restriction on driver's license for partial vision loss in one eye. Hebert said that he did see Jolivette prior to the accident occurring.

Hebert testified that he was traveling about 45 miles per hour prior to and when the accident occurred. Hebert did not apply his brakes or blow his horn. He admitted that he saw Hebert walking towards the roadway and stepping into the roadway in the direction that he was traveling. Hebert said that he was about twenty or twenty-five feet away when he saw Jolivette stepping onto the road from the shoulder into the lane adjacent to the one Hebert was travelling in.

Hebert reviewed some photographic evidence showing the location of the accident, and the skid marks left in the road after he hit his brakes following impact, which indicated he had veered off to the shoulder. Hebert testified: "I observed him getting ready to step onto the road. I looked away to see where I was going, and that's the last I seen [sic] him until he spun away from the truck." Hebert said that Jolivette apologized for walking into the truck and said he was looking the other way for his ride.

Rachel Louviere testified that she witnessed the accident. Louviere had been traveling behind Hebert's truck. Louviere had been on the telephone with her sister-in-law at the time of the accident. She testified:

> I . . . I was on the phone and it took me enough time to tell my sister-in-law "Is he going to stop?" and she was like, "what?' And I said, "The man that's crossing onto the road, he's going to walk into that truck. Oh my God, I have to hang up he just walked into the truck." . . . . He ran into the truck.

Louviere said that Jolivette was looking towards New Iberia, in the direction that his ride would approach from. She said that Jolivette never turned and looked to the right in the direction she and Hebert were traveling from Lafayette. Louviere said that upon impact with Hebert's vehicle, Jolivette "flew up into the air and landed on the ground really hard." She noticed that his ankle was twisted. On cross-examination, she said that Jolivette apologized for not noticing the truck.

Jolivette, who was sixty years old at the time of trial, testified that he had been employed as a diesel mechanic for the majority of his life. He began working at Valerus in 2012, about five or six months before the accident occurred, earning $15.00 per hour. At the time of trial, Jolivette was still employed by Valerus. Jolivette said that, on the days when his nephew would pick him up from work, he would look both ways before crossing the service road while standing in the Valerus driveway. He said he did not see the Hebert truck and started walking across the service roadway. He testified:

> Q. When you proceeded to cross the roadway, what direction were you looking?
>
> A. I was looking to the left.
> Q. Okay. Did you ever look back to the right before the accident occurred?
>
> A. No, sir.

. . . .

Q. But while you were walking across the road, you didn't look back either?

A. No, I didn't look back. I kept looking to the left.

Jolivette said that the truck mirror hit his hand, causing him to spin around fast and break his ankle. Jolivette was transported to the emergency room at Lafayette Regional, where medical personnel performed X-rays and bandaged his ankle and wrist. By the next morning, Jolivette's girlfriend noticed that his hand was turning black. Jolivette decided to go to a different hospital—Lafayette General—where medical staff again took x-rays, but found that his hand was fractured and his ankle was broken. The following day, surgery was performed on his wrist and pins were placed. Jolivette said the hospital wanted to perform surgery on his ankle, but because he had no health insurance at the time, he was referred to Earl K. Long hospital in Baton Rouge. Jolivette then went to Earl K. Long, where he was going to have surgery on his ankle. However, the surgery was cancelled due to Jolivette's potassium levels being too high. Jolivette did not have the surgery at all—instead his ankle was placed in a cast and a boot— and he used a walker to get around.

Jolivette testified that he was released to return to return to work sometime in February 2013. He testified that his ankle continued to hurt, and he saw Dr. Louis Blanda in March 2015, who advised that he needed surgery. However, Jolivette testified that he is apprehensive about the surgery because he does not want to be laid off from his job, when he had already had a significant decrease in hours due to the slowdown in the oilfield. On cross-examination, Jolivette said Valerus did provide him with health insurance in March 2013.

4

Dr. Matthew Williams, an orthopedic surgeon, testified via deposition that he saw Jolivette the day after the accident. Dr. Williams placed the pins in Jolivette's hand. Dr. Williams testified that, with a laceration over a bone, the risk of infection is increased. Thus, he performed the surgery to clean the wound and then pin the fracture or stabilize the bone, which would also allow the skin to heal. Dr. Williams said that had there not been an open wound on the hand, it could have been treated with a cast. Dr. Williams testified that the small pins that were placed in Jolivette's hand were removed after a few weeks and no pins remain in this hand.

Dr. Williams then discussed Jolivette's ankle fractures. He recommended surgery for one of the fractures and non-operative treatment for the other. However, the surgery could not be performed due to swelling of the ankle. Thus, he was placed in a cast, with surgery to be performed at a later date. Dr. Williams said that Jolivette would need crutches or a walker to ambulate. Jolivette was seen by Dr. Williams at a follow-up visit on October 18, 2012, and referred to Earl K. Long for the ankle surgery because he did not have health insurance. Dr. Williams next saw him on December 21, 2012, and noted that the wounds were healed, there was no swelling or redness in his hand, and he had full range of motion. However, Dr. Williams said that Jolivette did not return for his next appointment on January 15, 2013, and Dr. Williams had not seen him since.

Dr. Louis Blanda, an orthopedic surgeon, testified via deposition that he first saw Jolivette on March 3, 2015. Jolivette complained of pain and numbness in his right hand and constant severe pain in his ankle. At this visit, Dr. Blanda recommended arthritis medications. Dr. Blanda opined that Jolivette's condition "was gonna progress rather rapidly and that he would probably need to have the ankle fused at some point sooner or later. It was just a matter of whenever his pain

5

became intolerable." Jolivette returned on June 4, 2015, at which time Dr. Blanda gave him an internal orthotic for his work boots and recommended a consult with a foot and ankle specialist to consider having his ankle fused. Dr. Blanda assigned a permanent disability rating of 5% to Jolivette's hand and 15% to his ankle.

Josephine Walker, Jolivette's girlfriend, testified that he was in pain after the accident and needed assistance in daily living and ambulation. She said that his ankle continues to bother him and he "puts rub on it and exercises it." She further testified that his wrist bothers him every now and then.

### Fault Allocation

As in all tort claims, we apply the duty-risk analysis to the particular facts and circumstances of the case in determining the reasonableness of the parties' behavior. *Mart v. Hill*, 505 So.2d 1120 (La.1987). Both motorists and pedestrians owe certain duties when navigating the roadways of our state. A pedestrian is obligated to observe nearby traffic when negotiating a street or roadway. *Miller v. Bailey*, 621 So.2d 1174 (La.App. 3 Cir.), *writ denied*, 629 So.2d 358 (La.1993). La.R.S. 32:213. The pedestrian must not "suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield." La.R.S. 32:212(B). The pedestrian must further yield the right-of-way to vehicles on the roadway when a marked crosswalk does not exist. La.R.S. 32:213. A driver must exercise due care to avoid colliding with pedestrians on roadways and must blow his horn when necessary. La.R.S. 32:214.

In reviewing fault allocation, the factfinder's allocation is a factual determination that is owed deference and is subject to the manifest error/clearly wrong standard of review. *Clement v. Frey,* 95-1119, 95-1163 (La. 1/16/96), 666

So.2d 607. The supreme court recently summarized the manifest error standard of review:

> This court has announced a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). *See Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings. *See id.* The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *See id.*

*Lobell v. Rosenberg*, 15-247, p.10 (La. 10/14/15), 186 So.3d 83, 90.

In reviewing the factfinder's allocation of fault, the supreme court has set forth various factors for consideration:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985). In *Clement*, 666 So.2d at 611, the supreme court instructs that: "After the court of appeal finds a 'clearly wrong' apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion."

After reviewing the entirety of the record, we find that a reasonable factual basis exists for the jury's fault allocation and we, therefore, are unable to disturb it. The jury did not manifestly err in assigning 70% of the fault to Jolivette and 30% fault to Hebert. The way in which Jolivette collided with the truck and the

7

testimony of Louviere and Jolivette indicate that Jolivette was not carefully negotiating the street but was instead focused on whether his ride was approaching from the opposite direction. Hebert, on the other hand, saw Jolivette stepping in the roadway but looked away briefly to see where he was going. Jolivette should have seen the large work truck approaching as his view was unobstructed. Hebert should have proceeded more cautiously once he noticed Jolivette stepping into the roadway. However, it was not manifestly erroneous for the jury to assign a greater portion of the fault to Jolivette. Accordingly, the assignments of error pertaining to fault allocation are without merit.

*Damages*

In a landmark Louisiana Supreme Court case, *Wainwright v. Fontenot*, 00-492, p. 6 (La. 10/17/00), 774 So.2d 70, 74 (alteration in original), the standard to be used by an appellate court when reviewing a quantum award was set forth:

> The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993). Moreover,
>
> > before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.
>
> *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.1977) (internal citations omitted).

*General Damages*

We find that the jury abused its discretion awarding Jolivette only $10,000 in general damages for physical pain and suffering, past and future. This amount was abusively low considering the wrist and ankle fractures suffered by Jolivette that necessitated surgery on his hand and a cast on his foot. Therefore, we will raise the award to the lowest amount the jury should have awarded to Jolivette for general damages, $36,000. Far more has been awarded for similar injuries in the past, and this is the lowest amount that can be reasonably awarded for the injuries suffered by Jolivette.

The jury did not abuse its discretion in refusing to award any amount for loss of enjoyment life, because there was no evidence that Jolivette was deprived of engaging in activities that were enjoyed prior to the injury. Therefore, the jury could have reasonably concluded that no award for past loss of enjoyment of life was due Jolivette.

*Special Damages*

Special damages are those damages that may be determined with some degree of certainty and include past and future medical expenses and past and future lost wages. *Wainwright v. Fontenot,* 00–492 (La. 10/17/00), 774 So.2d 70. The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence. *Cormier v. Colston,* 05–507 (La.App. 3 Cir. 12/30/05), 918 So.2d 541. We find the jury did not abuse its discretion in refusing to award damages for future medical expenses or loss of earning or for awarding $8,600 in past loss wages. Clearly, the jury did not find that Jolivette would incur any future medical expenses or loss of earnings. This is reasonable in light of the fact that Jolivette had steadily worked since March 2013, and had not seen any

9

medical professionals regarding his ankle until more than two years had elapsed from his visit with Dr. Williams. Further, Jolivette did not seek any treatment for over two years, even though he had health insurance as of May 2013 through his employer. It was only at the behest of his attorney that he saw Dr. Blanda. The factfinder can reject the testimony of expert witnesses and substitute common sense when warranted. *Green v. K-Mart Corp.*, 03-2495 (La. 5/25/04), 874 So.2d 838. It was within the jury's discretion to discredit Dr. Blanda's claims that Jolivette would need future surgeries based on his limited treatment of Jolivette and the information provided by Jolivette to Dr. Blanda.

We cannot say that the jury abused its discretion in awarding $8,600 in past lost wages. Apparently, the jury concluded that Jolivette worked less hours than he claimed or could have returned to work sooner than he did. This conclusion is reasonable in light of the credibility determinations the jury is required to make and the fact that Jolivette sought no further medical treatment until March 2015, two years after his visit with Dr. Williams in December 2012.

## CONCLUSION

The judgment of the trial court finding the plaintiff, Wilson Jolivette, 70% at fault and defendant, Ray Hebert, 30% at fault is affirmed. The jury's damages award is affirmed in all respects except that the general damage award of $10,000 for past and future pain and suffering is raised to $36,000. Costs of this appeal are assessed equally between the parties.

**AFFIRMED AS AMENDED**.