# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**17-900**


**JOE RICHARD**

**VERSUS**

**EUGENE GUILLOTTE**


**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 128418
HONORABLE ANTHONY THIBODEAUX, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION**
**JUDGE**

**********


Court composed of Marc T. Amy, Shannon J. Gremillion, and Candyce G. Perret, Judges.


**AFFIRMED.**

**Michael W. Campbell**
**Caffery, Oubre, Campbell & Garrison, L.L.P.**
**100 E. Vermilion St., Suite 201**
**Lafayette, LA 70501**
**(337) 232-6581**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Joe Richard**

**Leon J. Minvielle, III**
**Haik, Minvielle & Grubbs**
**P. O. Box 11040**
**New Iberia, LA 70562-1040**
**(337) 365-5486**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Eugene Guillotte**

**GREMILLION, Judge.**

The plaintiff/appellant, Joe Richard, appeals the trial court's judgment awarding him $500 and court costs. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Richard is the owner of a metal building located in New Iberia, Louisiana, which was leased to the defendant/appellee, Eugene Guillotte, for a period of about fifteen years ending in November 2015. Guillotte operated a collision repair and auto sales shop. In January 2011, a fire accidentally occurred in the building when a truck floorboard ignited from sparks emitted while Guillotte was welding.

Richard filed a petition for breach of contract on rent agreement in June 2016, alleging that Guillotte owed him $1,734.75 for the removal of a sign, $6,792.00 for a damaged overhead door, $36,780.00 for replacement of a metal roof and metal walls, and $966.00 in back rent.

Following an April 2017 trial, the trial court awarded Richard $500.00 for remaining smoke damage related to the welding fire and cast him with all court costs. Richard now appeals. For the following reasons, we affirm.

## ASSIGNMENTS OF ERROR

1. The trial court's denial of awarding Appellant the property damages resulting from the fire in the amount of $36,780.00 was manifest error and clearly wrong.

2. The trial court's award of only $500.00 in damages to the Appellant was manifest error and clearly wrong.

3. The manifest error and clearly wrong Judgment of the trial court warrants a *de novo* review of the record which supports a finding of liability and damages in favor of Appellant with Appellee to pay all court costs.

# DISCUSSION

*Manifest Error*

The supreme court summarized the manifest error standard of review:

> This court has announced a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). *See Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings. *See id.* The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *See id.*

*Lobell v. Rosenberg*, 15-247 p. 10 (La. 10/14/15), 186 So.3d 83, 90.

A trial court is in a better position to make credibility determinations as it has the benefit of examining the nuances of a witness's testimony and demeanor. *Lopez v. Lopez*, 00-660 (La.App. 3 Cir. 11/2/00), 772 So.2d 364.

The trial court set forth oral reasons for its findings at the conclusion of trial. First, it found no rent was due because it had been paid through October 15, 2015, with the rent for the month of November having been bartered for a clear coat application by Guillotte to a car owned by Richard. Therefore, the claim for back rent was dismissed. The trial court further found that the damages to the overhead door pre-existed the fire based on the testimony, the chain system used to raise and lower it, and the "constant" calls to have it repaired. Therefore, damages related to the overheard door were dismissed as the trial court found "they probably existed prior to the Guillottes taking possession of the place." Relating to the sign, the trial court found Richard failed to prove that it was not a gift given to Guillotte by Richard. Therefore, it dismissed any claims relating to the sign.

Relating to the smoke damage, the trial court found:

[T]here's no doubt that the cause of any damages to this building, the remainder of it . . . the fire damage . . . was definitely caused by Eugene Guillotte welding on a vehicle inside that building for its intended purposes, okay? . . .[T]he vehicle overheated, and it caught on fire, and that's what caused the damages to the building[.]

. . . .

The court finds that the condition of the building, as demonstrated in Defendant's Exhibit 1, is the manner in which it was as of November 15, 2015, the day that the Guillottes exited the building in question. The lighting was repaired, and the building was pressure-washed. It looks like the entire – that entire section of that building did receive some soot damage to the – probably to the inside of the whole building, the purlings, the rafters, the plastic that holds up the – that rests on the purlings which holds up the insulation. Exhibit 9 reflects it very well . . . and P-7 and P-8. P-8 shows the damage to the lighting. Exhibit 9 shows the lighting repaired.

Defense Exhibit Number 1 shows the lighting repaired and soot removed from the rafters and the purlings and from the walls and from the plastic leaving – there's a little bit of gray on that plastic[.] . . .

. . . .

I'm going to assess you at $500 cost for leaving that gray on that plastic, okay, because you messed up the aesthetics of the building. Even though it is an industrial building for mechanic work, okay, it should still look pretty, because mechanics are people too.

. . . .

James Stewart testified he did the assessment. The estimate of the damage is $36,378. And since then, the materials to repair the building have increased by eight percent. He inspected the building in March of 2016. He personally physically inspected the building and found heat damage to the roof. He has no idea if it was leaking. He doesn't know if the building itself had burned. . . . The area that needed replacement of roof materials was put in the quote. He never visited the building before 2016.

He did testify that the structure underneath the metal structure, the purlings and I guess the rafter beams, structural – eave struts, that's what they call them – needed to be replaced, because they got so hot the paint melted on them.

3

He also testified that the metal on top of the roof – remove and replace thirty-two feet by two hundred twenty-five foot roof with new three-inch insulation and twenty-six gauge RP galvalume aluminum in the amount of $21.600 – that was damaged by the fire.

I don't understand – but I see no evidence of that other than his testimony. I've seen no photographs of damage to the metal. I find it hard to believe that the metal could be damaged, but the plastic underneath it was not damaged. But yet, then again, the purlings and the struts that were holding up the plastic got so hot the paint melted on them. But yet the plastic was not damaged. I find that incredible.

It says the front wall – needed to replace thirty-one sheets and the door trim on the OHD, $3,200. No, it just needs to be pressure-washed.

Same thing for the back wall. Replace seventy-five sheets in the amount of $7,655. What were the sheets made of? What type of material?

Inside first bay, purlings and eave struts, $4,325. I don't see where there's a need for that.

I do not give this man any credibility whatsoever. He certainly didn't develop his report. I don't know what type of materials that needed to be used to replace thirty-one sheets and door trim on the front wall. If plastic didn't melt, what happened – what caused – and what kind of damage was that? Smoke damage. And that's been cleaned with a pressure washer.

So I'm denying his claim for damages which he's seeking, the $36,780 for damages to the building.

And he says on redirect the building probably leaks, because the neoprene washer between the screw that pushes down the metal onto the purlings or the struts, okay, the neoprene washer would have melted. If the building would have melted, well, the washer would have melted. So he assumes that the washer melted, and it would cause a lot of water damage and leaking constantly. The testimony is, since that date – I didn't hear testimony from the owner that the roof leaked. And I heard testimony from the defendant and his sister that he called as a witness; the roof never leaked. So his credibility with me is not doing well. . . . So I discount his report completely.

The following testimonial evidence was presented at trial:

*Guy Bonin*

Bonin, the Iberia Parish Fire Chief, testified that he arrived at the scene of the fire at Gene's Collision in January 2011. He noted damage to a truck, car, and the building itself. Bonin said there was smoke damage and heat damage to the metal because "the metal may have been buckled a little bit on the roof top." However, he did not inspect the roof.

*Corey Leblanc*

Leblanc, a captain in the Iberia Parish Fire Department, was also on scene the day of the fire. His report noted that the department "[f]ound heavy smoke showing from a metal building with vehicle fully engulfed." He described the damage as smoke damage except for the metal roof immediately above the car that was engulfed, which suffered heat damage. Leblanc, however, did not conduct an inspection of the roof and did not recall if there was insulation below the roof line.

*Michael Vincent*

Vincent, a deputy fire chief with the Iberia Parish Fire Department, testified that upon arrival "They had a couple of vehicles on fire, a lot of black smoke coming out the building from open garages." He said he noticed the heat damage on the interior ceiling.

*James Stewart*

Stewart, the owner of Iron Man Construction, testified that he builds warehouses, car dealerships, churches, and the like and has been in business for thirty-two years. He has thirty-four employees. He testified that he has built metal buildings such as the one involved in this case. Stewart was admitted by the trial court as an expert in the field of construction of metal buildings.

5

Stewart inspected the building in March 2016, more than five years after the fire. Stewart testified the building needed "thirty-two foot by two hundred and twenty-five foot of roof with new insulation and twenty-six gauge r-panels galvalume which is unpainted." Stewart said the front wall would need thirty-one sheets and new door trim.[1] The back-wall replacement would be seventy-five sheets. He further opined that the first three bays of purlings and eave struts needed to be replaced because they were warped from the fire damage. Stewart opined that all of the repairs were necessitated by the smoke damage that occurred in 2011 and would cost $36,780.00.

Stewart reviewed numerous pictures submitted into evidence and described smoke damage on the roof interior and smoke damage on the bay doors on the exterior. He said he personally inspected the roof and there was "heat damage." He had no idea if the building leaked or if the building itself burned. Stewart testified that in the first three bays, the panels had warped like the iron below but that the screws on top of the roof are made of neoprene and would melt. He said it probably leaks horribly but he had not been there when it was raining so he did not know.

*Joe Richard*

Richard testified that after Guillotte's departure in November 2015, the building was rented to a Mr. Flores, but he was only open for business for five or six months. He said no one had rented the building since. Richard said the fire occurred in the first bay, but the ceiling damage extended the entire 225-foot length of the shop. However, when questioned if the ceiling caught on fire, he did not know. The trial court questioned Richard about the difference in smoke

---

[1] Stewart did not actually describe what kinds of "sheets" he was referring to although we assume he is referring to sheets of metal. Galvalume is a brand name of aluminum-coated steel.

damage and fire damage. Richard stated that "it burnt all the insulation. And if you look very closely, all the seams on the insulation are all burnt up." Although Richard repeatedly commented that the building suffered fire damage, he was questioned:

> Q. But my question is: When you say that it's fire damage, you're not saying it was actually burned. You're saying that some of that was burned or melted from heat, but some of it was also from smoke?
>
> A. Right. The whole building didn't get burnt. That's why the man said, Door One, Two, and Three, he bidded on. It didn't burn all the way to the very end, but it damaged enough for one, two, three bays.

Richard then testified to other damages he claimed to the building, including what he thought was a cut to an overhead door from a forklift. Pictures were introduced, which Richard claimed he took on the day of the fire. Next, he discussed the sign on the side of the building that said "Guillotte's Collision Repair." Richard said he owned the sign because he paid someone to create it before Guillotte moved in. He said Guillote took it and has never brought it back. Richard claimed the five-year-old building had been in "tiptop shape" when Guillotte moved in.

Richard discussed some pictures of the interior ceiling that he took the day of the fire, which showed a layer of thin plastic then insulation. Defense counsel questioned Richard as to why the plastic protection was not melted if the fire was so hot. Richard testified, "If you go visually look at it, you would have to say different, if you go physically and look at it." Then he stated, "They actually have some pictures on the very corner where it busted through the – the insulation is coming out on some of them pictures way over there." However, these pictures he referenced were not submitted into evidence because they are "just some little side pictures," and they were "trying to save on the amount" and "spare the court of looking at more photographs."

7

Richard was then presented with pictures evidencing unrepaired water damage in the bathroom and admitted he never had it fixed.

*Eugene Guillotte*

Guillotte testified that he is the owner of Gene's Collision Repair and Auto Sales, which was previously Guillotte's Collision Repair when he and his father rented the building from Richard. However, a few months later Guillotte took over the business.

Guillotte testified that in 2002, when he first rented the building, Richard did not require a deposit because there were minor repairs that Guillotte himself undertook before moving in. Guillotte discussed the sign, which he said was a housewarming gift. He said "If it wasn't a gift, I wouldn't have taken it. I don't steal anything." He further said that the police determined that it was a gift, and he was not required to give it back. Regarding the overhead door, Guillotte said that its problems preexisted him taking over the building and that they were always working on it because the chain was constantly coming off. He said they had to climb on top the building and risk injury in order to fix it themselves because Richard would not perform any repairs.

Guillotte said that they were open for business the day after the fire occurred. When shown the pictures presented by Richard, Guillotte testified:

> Q. I'm going to show you Plaintiff's Exhibits 7, 8, and 9. Does that adequately reflect or accurately reflect the smoke damage to the ceiling area?
>
> A. Everything looks- it looks- from the smoke damage, yes, except for this insulation hanging. That wasn't like that when we moved out of there.
>
> . . . .
>
> Q. He says that picture was taken the day of the fire.

A. You can tell this right here is fresh. The yellow insulation is really bright.

Guillotte then pointed out that two of the pictures that Richard claimed to have taken on the day of the fire were inconsistent because one depicted an "Interstate Batteries" sign, which Guillotte said he only took when he left in November 2015.

Guillotte said the roof has never leaked and that he would have known if it did because a leaky roof would not have worked in his business painting cars. He then discussed a picture he took showing the car belonging to Richard that he did the clear coat on in trade for rent. Guillotte pointed out that his "Interstate Batteries" sign was not there because he had taken it down and that no insulation was hanging from the ceiling in the picture. He said that after the fire, he pressure-washed the ceiling, the roof, and the sides. He changed all of the electrical and lighting fixtures that were damaged. He described how he tried to get the smoke off of the clear plastic covering the insulation in the ceiling in the stall where the fire occurred but that it would not come off despite pressure washing and bleach.

The trial court then questioned Guillotte about "some plastic coating for the insulation heated up and kinda melted down." Guillotte informed the trial court that the plastics were motorcycle plastics that he had hanging in the shop and that there were gas tanks for motorcycles, which would have blown up had the fire or heat reached them (they were in an elevated portion of the building below the insulation). Thus, it was not the plastic that was supporting the insulation that had melted; rather the heat had melted some of the plastic motorcycle parts that were hanging in the building.

9

Guillotte then testified to numerous deficiencies with the building that Richard would not repair including termite damage that left a hole in the wall, black mold from a leaking hot water tank, and a toilet that he replaced at his own expense. Although Guillotte had a general liability insurance policy in effect, he did not have a policy to cover the building, nor did Richard. However, Guillotte said that Richard told him to get one after the fire, which he did.

*Shelly Guillotte[2]*

Shelly, Guillotte's sister, testified that she had worked for him since 2001 doing paint and body work and sometimes helping out in the office. Following the fire, Shelly testified that they had "a bunch of cleaning to do" and had pressure-washed the inside "a lot" of times. She said there was a lot of black soot on the walls. When questioned whether the insulation melted or fell down from the ceiling, Shelly replied that it had not melted or fallen down, but that it did "have a lot of black soot on it." She said the light fixtures in the first two-to-three stalls were replaced. Shelly described the location of the office as being right next to the stall where the fire occurred. She said there was no damage to the office. She described some of the issues with the building including termites and plumbing issues. She said that Richard " sometimes" fixed them.

*Cindy Frederick*

Frederick, Guillotte's mother, testified that she would go to the business to help out with the books, monthly taxes, run errands, and go to the bank. Frederick arrived on scene shortly after the fire. She said the only damage she saw was to the two vehicles that caught fire and that the roof had black soot on it. She said there was no insulation that was melted or falling down. She testified that the car

---

[2] Note that we refer to Shelly by first name only to distinguish her from the Plaintiff because they share the same last name.

that caught fire was probably ten to fifteen feet from the office and that they were thankful that there was no loss of records located in the office, which had no damage.

Based on our review of the record, we cannot say the trial court manifestly erred as its findings are reasonably supported by the record. The trial court clearly did not find Richard or Stewart's testimony credible, and that finding is not manifestly erroneous. The "expert" who testified on Richard's behalf inspected the building five years after the fire. He barely gave enough information for a basic understanding of what the $36,760.00 worth of repairs was comprised, much less connect the alleged damage to the roof to the fire on the interior that did not even melt the plastic covering the insulation. Richard's own inconsistencies and the photographic evidence simply did not support his claims. In fact, his own evidence contradicted his claims. The trial court even asked for clarification:

TC: Does anybody have a picture of the metal damage?

. . .

PLAINTIFF'S COUNSEL: No, sir. Joe [Richard] didn't go up there.

TC: 'Cause I'm trying to figure out how there's some plastic between the plastic and roof. And if the metal roof melted, how come the plastic that precedes it did not? I'm having a difficult time with that.

. . .

TC: . . . Do y'all have any evidence about that?

PLAINTIFF'S COUNSEL: Other than the testimony of the expert, who said he got up on the roof and it was – there was heat damage.

Richard failed to meet his burden of proving that he was owed any damages for replacement of nearly the entire metal building. The trial court's finding that Guillotte owed him $500.00 for some remaining grey soot was entirely reasonable, and we will not disturb it.

11

## CONCLUSION

The judgment of the trial court awarding the plaintiff/appellant, Joe Richard, $500 and assessing him with all court costs is affirmed. All costs of this appeal are assessed to Joe Richard.

**AFFIRMED**.