STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

GABRIEL ACOSTA

VERSUS

AMERICAN POLLUTION CONTROL CORPORATION

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 00130132-E
HONORABLE KEITH COMEAUX, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION
JUDGE**

**********

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and John E. Conery, Judges.

**AFFIRMED.**

**Grady J. Abraham**
**Attorney at Law**
**5040 Ambassador Caffery Parkway, Suite 200**
**Lafayette, LA 70508**
**(337) 234-4523**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Gabriel Acosta**

**Andrew H. Myers**
**Breaud & Myers**
**P.O. Box 3448**
**Lafayette, LA 70502**
**(337) 266-2200**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **American Pollution Control Corporation**

**GREMILLION, Judge.**

The plaintiff-appellant, Gabriel Acosta, appeals the trial court's judgment dismissing his claims with prejudice for overtime wages against his former employer, the defendant-appellee, American Pollution Control Corporation (AMPOL). For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Acosta was employed at AMPOL from April 2015 until his termination on January 9, 2017. In April 2017, Acosta filed a Rule to Show Cause via a summary proceeding why AMPOL should not be ordered to pay him $27,057.75 in overtime wages that he claimed to have earned over a five-month period from July 16, 2016 through December 31, 2016, in violation of La.R.S. 23:631. In 2016, Acosta earned $176,533.50 in wages, of which $119,723.30 was paid for overtime. Acosta alleged that his supervisor, Brooks Tastet, told him to fabricate time cards so that he was not showing that he worked over 100 hours per week regardless of how much time he actually worked.

Following a two-day hearing on the rule, the trial court issued a judgment in favor of AMPOL, dismissing Acosta's claims with prejudice. Thereafter, Acosta filed a Motion to Re-open the Record relating to attorney fees, which the trial court denied. Acosta now appeals.

## ASSIGNMENTS OF ERROR

Acosta assigns as error:

> 1. The Trial Court erred when it failed to apply the *Fair Labor Standards Act 29 U.S.C. §207* to the Plaintiff's claim for unpaid overtime wages.

> 2. The Trial Court erred when it denied the plaintiff's claim for unpaid overtime wages pursuant to *29 U.S.C. §207* and/or *La.R.S. 23:631* where the Trial Court found that the employee worked the hours he claimed with his employer's knowledge and consent but the work was performed in violation of his employer's illegal company policy.

3. The Trial Court erred when it denied the plaintiff['s] claim for penalty wages and costs, including attorney fees, pursuant to *29 U.S.C. §216* and/or *La.R.S. 23:632*, where the employer-defendant did not have a good faith defense for refusing to pay the wages owed.

## DISCUSSION

### *Assignment of Error One/Fair Labor Standards Act/29 U.S.C. §207*

Acosta's claims pursuant to 29 U.S.C. §207 (the Fair Labor Standards Act/FLSA) are being raised for the first time on appeal. The FLSA was neither mentioned in his pleadings nor at the hearing on the Rule to Show Cause. Acosta cannot now assert claims under the FLSA. *See* La.Code Civ.P. arts. 425 and 891. Accordingly, assignment of error one is without merit.

### *Assignment of Errors Two and Three/Overtime Pay, Penalties*

### *Manifest Error Review*

The supreme court summarized the manifest error standard of review:

This court has announced a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). *See Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings. *See id.* The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *See id.*

*Lobell v. Rosenberg*, 15-247, p. 10 (La. 10/14/15), 186 So.3d 83, 90.

A trial court is in a better position to make credibility determinations as it has the benefit of examining the nuances of a witness's testimony and demeanor. *Lopez v. Lopez*, 00-660 (La.App. 3 Cir. 11/2/00), 772 So.2d 364.

Wages and overtime pay owed to any employee upon termination is addressed in La.R.S. 23:631(A)(1)(a):

2

Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

Louisiana Revised Statutes 23:632 addresses an employer's failure to pay wages:

A. Except as provided for in Subsection B of this Section, any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages.

B. When the court finds that an employer's dispute over the amount of wages due was in good faith, but the employer is subsequently found by the court to owe the amount in dispute, the employer shall be liable only for the amount of wages in dispute plus judicial interest incurred from the date that the suit is filed. If the court determines that the employer's failure or refusal to pay the amount of wages owed was not in good faith, then the employer shall be subject to the penalty provided for in Subsection A of this Section.

C. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.

The employee bears the burden of proving by a preponderance of the evidence that he is entitled to wages and penalties under La.R.S. 23:631 and La.R.S. 23:632. As La.R.S. 23:632 is penal in nature, it is strictly construed, and a good faith defense will prevent the imposition of penalty wages. *Bear v. Summit Institute of Pulmonary Medicine & Rehabilitation*, 97-1784 (La. 3/4/98), 707 So.2d 1233.

At the conclusion of the hearing, the trial court stated:

Mr. Acosta worked extremely long hours for American Pollution Control Corporation. The Court has considered all of the testimony and finds that Mr. Acosta was a dedicated employee. The Court further finds that Mr. Acosta was a hard worker. But the Court does find that Mr. Acosta doesn't listen to orders. The Court finds that American Pollution Control informed Mr. Acosta that he was not to work over a hundred hours of work per week. Mr. Acosta violated those orders, although he felt as though he had to do that in order get his work out. Mr. Acosta had two options, either go to management and indicate to them that he could not complete his work for the number of hours that he had or quit the job if he was working too long of hours.

The Court finds that he violated the orders from American Pollution Control, and therefore, is not entitled to a judgment because he worked more than the number of house that American Pollution Control told him to work. Therefore the Court will deny the claim of Mr. Acosta at Mr. Acosta's cost.

*Testimony*

Kirk Headley, the President and CEO of AMPOL, testified that Acosta earned $25.00 per hour and $37.50 in overtime pay for anything over a forty-hour work week. His overall testimony was that Acosta routinely turned in huge amounts of overtime exceeding 100 hours a week and that on numerous occasions verbal instructions were given to Acosta that he was to have management approval to work overtime, which Acosta routinely ignored.

Brooks Tastet testified that he was Acosta's direct supervisor and the Director of Operations. He described Acosta as a "scam artist" who got paid for many more hours than he acutally worked. Tastet testified that Acosta was repeatedly told not to exceed working a certain number of hours but would sit on the clock and sleep at work and claim overtime pay. Tastet said conversations with Acosta about reducing overtime began about six to eight months before Acosta was terminated but that he routinely ignored instructions to not work more than 100 hours a week. Tastet clarified that the "work" Acosta claimed to do was unnecessary work such as sweeping the floors in the middle of the night when he would sleep at the AMPOL facility. Tastet testified:

I told him work one hundred hours or less. I didn't say you're not getting paid. I said you work a hundred hours or less. That's the cap. And he keeps pushing it. I'd be worried about my job because you're disregarding an order from an upper level manager in the company. And then, furthermore, it came from Jeff Ducato who was now acting General Manager. I'm sure, at some time or another, it came from Kirk Headley as the CEO. And you still push the envelope. There was times that he was seen sweeping the floors for two or three hours in the middle of the night.

Tastet further testified regarding the text messages which Acosta claims indicate that Tastet instructed him to fabricate time cards. The texts exchange is as follows:

Tastet: You're going to need to cut your hours back brother?

Acosta: Are you serious, we're doing this again?

Tastet: I know, but Kirk doesn't want to pay the OT at your pay rate when he can pay techs less for the same work.

Acosta: I agree in regards to the cost, but please let me know which techs and when. I haven't had ANY help for months now as far as techs go to include replacing Ron or Angela and everything still gets done all by myself.

Tastet: I know brother. We all know what you do and how much you do and I appreciate it. It's chicken shit but he is the CEO and it's his company.

Acosta: There's no way that I can get everything done Brooks, not by myself. Plus you know it's not me to walk away from work that needs to be done or to set myself up for more work the next day.

Tastet: Do what you have to complete what you have. Your time just cannot exceed more than 100 hours per week. That's the best I could do and even that was hard to get him to understand.

Acosta: So basically my time card needs to reflect no more than 100 hrs regardless of how much time it takes or how much I'm here?

Tastet: Correct

Acosta: Roger that. I'll "fabricate' my time card to reflect no more than 100 hours per week.

Tastet: Thanks brother!

Tastet then addressed the texts:

> Like I said, they were taken out of context because there were multiple conversations that, of course, are not in your favor or Mr. Acosta's favor that did not make it here that attest to, if you work more than a hundred hours, I'm going to tell you do not come in anymore. Plain and simple. There is nothing in that shop that required more than a hundred hours except maybe for that small period of time, or two months tops, that we were on a major spill. My direction was always to delegate.

Tastet testified that Acosta was having marital problems and would often sleep on a cot at the AMPOL facility. He brought beer to the facility that he kept in a cooler. Tastet also said that, at one point, Acosta had a key to the time clock, which would allow him to manipulate it in anyway possible. Tastet was then questioned about some time cards from two days in October 2016, which indicated that Acosta clocked in at 6:00 a.m. and clocked out at 8:00 p.m. Tastet had noted on the time cards "sick per Brooks" and said that Acosta was not present on those two days and was not paid for those two days. Tastet testified that "He got paid for way more than what he worked over his time there. Definitely I can state that, yeah." He further testified that there were no reasons in the last half of 2016 that would require Acosta to work the number of hours he claimed to have worked and that "he's been over-compensated already."

Jeffrey Ducato testified that he began working at AMPOL in August of 2015 and was in charge of special projects, which encompassed a wide variety of things such as analyzing the overtime of the company. Ducato said that there were employees working seven or eight hours of overtime and then Acosta, who claimed to be working 100 hours of overtime. He said that "[Acosta] was given an allowance of a hundred hours which was ten times more than any other employee was getting." Ducato then discussed how AMPOL advanced Acosta money to buy tires and have his vehicle aligned and loaned him $7,000.00 to buy a welder, which he paid back

6

over time even though he was making $170,000.00 per year. He testified that Acosta was told over and over again about claiming excessive amounts of overtime and that he would do good for a week and then "boom, he'd come right back and start again." Ducato said he would have taken a harder stance earlier on but that it was not in his chain of command at the time. However, once he reached supervisory level, Ducato took action:

> So when I took the job [Chief Operations Officer] January 1st, I told Brooks we're done with this. We're going to bring Gabe in. We're going to be real clear on the expectations. No more bringing alcohol. No more parking the truck in the warehouse, because tools started to be missing big time. No more working Saturdays and Sundays. We're done playing this game. We brought Gabe in. This was January 9th. It was a Monday. I sat down. Brooks was in the room. Maybe the H.R. guy, I'm not sure. I said, Gabe, here's the law of the land and we're not varying from this. If you do this, this, this or this, you won't work here anymore. He signed it.

Q. That was January 9th?

A. That night he broke it.

Q. Okay. So you terminated him?

A. Exactly. That's exactly how it happened.

Ducato further testified that the last half of the year was extremely slow relative to the first half of the year when there was a big spill requiring a lot of overtime work. When questioned if there were any legitimate reasons for Acosta to work in excess of one hundred hours per week during the last half of the year, he replied, "Absolutely none."

Acosta testified that he worked at AMPOL for approximately two years. He testified regarding his duties as facilities manager. He then discussed the time cards entered into evidence stating that, "I was instructed to fabricate – well, not fabricate, was told to fabricate to not exceed no more than a hundred hours per week regardless of how much I worked." When questioned about the testimony that he created work,

Acosta testified that he disagreed with the position that he was creating jobs because the warehouse needed to be cleaned. Acosta testified that his position was that regardless of how many hours he acutally worked, he would only be paid for 100 hours. In that regard, Acosta discussed the second set of time cards introduced into evidence, which he claims were the actual hours he worked "in comparison to the time cards that I was instructed to fabricate that would reflect only a hundred hours versus the amount of time that I did work." Acosta said that he kept the secret set of time cards for six months.

When asked how someone could work 120-130 hours per week and not pass out from exhaustion, Acosta said he was accustomed to it from working in the oilfield and as a Marine. Acosta said that AMPOL knew he was working that many hours because there is a camera in front of his office. Acosta disputed AMPOL's claim that late night calls would occur maybe once a week. Acosta also testified that he returned the timeclock key to Tastet sometime in February 2016. He admitted having a regular monthly appointment at the doctor but did not deduct it from the time cards he turned in to AMPOL because "those time cards reflect what I was instructed to turn in." He said he was not claiming that there were not times that he left. Acosta testified that he could not have completed his job duties without working 120-130 hours per week.

On cross-examination, Acosta said he lived about forty-five minutes away from the AMPOL facility. He admitted that he was claiming to have worked 18.6 hours per day, seven days a week, for six months straight. He admitted the doctor visits were not reflected in either set of time cards. When questioned about the two days in October that Tastet noted as sick days, Acosta stated that the hours he claimed to have worked on the second secret set of time cards, seventeen hours on October 20th and nearly nineteen hours on October 21st, were accurate, and Tastet's

8

notation must have been on the wrong days. Acosta claimed that those two days were in January 2016 before he was fired. However, he said he did not have the January time cards with him because the stipulated period he was claiming wages for ended in December. Acosta never punched out for lunch, either, and explained that he did not take a lunch or dinner but instead ate from the company vending machine. Acosta also testified that he worked Thanksgiving Day (18.25 hours), Christmas Day, and New Year's Day, stating that he worked every day and never took a day of vacation. He admitted that even the time cards he turned in to payroll were in excess of the 100 hours he was told not to exceed. For the week ending December 10, the turned-in time cards claimed a 122.5-hour work week, the week ending December 17, a 123.5-hour work-week, the week ending December 24, a 128.92-hour work week, and the week ending December 31, a 111-hour work week. Pay periods ending on November 5th, 12th, and 19th also reflect time cards submitted to AMPOL in excess of 120 hours per week. Acosta stated that, as a member of management, he did not require authorization to work overtime. Acosta was questioned:

> Q. Well, you've used the term fabricated. So the first set of time cards that you submitted to AMPOL on a weekly basis, that's a false set of time cards in your opinion, correct?
>
> A. It doesn't reflect the amount of hours that I did work.
>
> Q. So they're incorrect. They're inaccurate. Those time cards are inaccurate?
>
> A. They do not reflect the amount of hours that I did work.
>
> Q. So, therefore, those time cards are inaccurate. Agreed?
>
> A. They're false.
>
> Q. False. Okay. That's a better word. So you were submitting false time cards to AMPOL for the last six months of your employment there?

9

A. As per instructed by my employer.

Acosta was then questioned about several two-day periods on the "accurate" time cards that claimed he worked forty-one hours straight in a forty-eight-hour period. In some instances, the set of time cards submitted to payroll reflected that Acosta worked more hours than the "accurate" secret set. Acosta denied sleeping on the cot at the AMPOL facility, instead stating that he only removed it from his truck because it was taking up too much space. He further stated that he never slept in his truck.

Several co-workers testified that Acosta was a good employee and that as part of their job duties they would occasionally need to contact him after normal business hours. A former employee of AMPOL testified that Acosta was present at the facility sometimes until early morning hours.

Mary Broussard, the payroll clerk at the time in question, testified that she brought Acosta Thanksgiving dinner at the AMPOL facility on Thanksgiving Day. She said she honked her horn for about fifteen minutes until he came out to get it and that he explained that he had been sleeping in his truck. She further testified that there were "several occasions" when she looked for Acosta about payroll issues and no one knew where he was for two or three hours.

Based on this testimony, we do not find the trial court erred in concluding that Acosta was told to limit his working hours to 100 hours per week, which he continually refused to do. Acosta has already been compensated for many more than 100 per hours week, therefore the trial court did not manifestly err in concluding that he is not due any additional overtime wages. The underlying allegation made by Acosta is that Tastet told him fabricate time cards to reflect that he only worked 100 hours even if he worked greater than 100 hours. We do not find this to be the case. Instead, the trial court found that Acosta was told to not work more than 100 hours

per week. Acosta completely ignored the instruction to limit his working hours to 100 per week as evidenced by the submitted time cards routinely exceeding 100 hours per week. His second set of secretly-kept time cards do not advance his cause as they sometimes show that he worked less hours than the time cards submitted to the payroll department and do not account for times when Acosta was absent, such as doctor's appointments and absences from work which were never deducted.

Although not necessary to our finding that the trial court did not err, the question of whether he actually "worked" 120-130 hours per week was a much-discussed issue at the hearing. While the trial court found Acosta to be a hard worker and a dedicated employee, the testimony by Acosta's supervisor, which Acosta confirmed, was that Acosta spent time doing menial "work" at odd hours at overtime wages of $37.50 per hour, such as sweeping, that could have been completed by a $10.00 an hour employee, even though Acosta had been instructed not to do so numerous times. Further, reasonable people could easily conclude that Acosta's claim that he worked eighteen to twenty-hour days for six months straight without eating lunch or dinner and did not sleep at the workplace on the cot he brought was simply not credible. Acosta claimed he received phone calls all night long, yet supervisors testified that they only occasionally needed to call him and that an answering service was in place to take calls twenty-four hours a day. Acosta essentially spent his days at the AMPOL facility out of choice rather than necessity and in direct contravention of the order he was given.

As AMPOL points out, it paid Acosta for 8.27 hours of overtime *every single day* of the week for over five-and-a-half months straight. The trial court did not err in finding that Acosta failed to follow his employer's orders to limit his working hours to 100 hours per week. Accordingly, assignments of error two and three are without merit.

11

## CONCLUSION

The judgment of the trial court in favor of the defendant-appellee, American Pollution Control Corporation, dismissing the plaintiff-appellant, Gabriel Acosta's, claims is affirmed. All costs of this appeal are assessed to the plaintiff-appellant, Gabriel Acosta.

**AFFIRMED**.